[No. 27425. *En Banc.* November 1, 1939.]

CLARENCE C. THOMPSON *et al., Respondents,* v. CLARENCE R. WEIMER, *as Executor, Appellant.*[1]

[1]Reported in 95 P. (2d) 772.

*Lynn J. Gemmill* and *A. H. Denman,* for appellant.

*Leo Teats* and *Ralph Teats,* for respondents.

ROBINSON, J.—This is an action to enforce an equitable claim against an estate.

William J. Thompson died at Wenatchee, Washington, August 1, 1937. His will, executed July 20, 1937, revoked all former wills, bequeathed forty shares of stock in Peoples' Oil and Gas Company to Alice Eckersley, devised and bequeathed all the rest and residue of his property to Clarence R. Weimer and his wife, Dora M. Weimer, and nominated Weimer as his executor. The will was admitted to probate in the superior court of Pierce county on August 9, 1937. Clarence R. Weimer was appointed executor, and immediately qualified.

On February 1, 1938, Clarence C. Thompson and Eva Thompson, his wife, served on Weimer's attorney, and on February 5th filed in the records of the probate case, the following verified claim:

"Deceased entered into an oral contract with claimants in spring of 1936. Said contract provided that claimants were to move to Tacoma as soon as claimants could arrange their affairs; that deceased was to make his home with claimants for the balance of his lifetime.

"That in consideration of claimants furnishing deceased a home and to care for him, deceased agreed to devise unto claimants the bulk of his property.

"That claimants on or about June 6, 1937, pursuant to said agreement, gave up his position in Pasadena, moved to Tacoma. That immediately upon claimants

establishing a home in Tacoma, deceased in compliance with the terms of said contract, moved into claimants' home.

"That claimants performed all of the conditions of said contract. That on or about the 30th day of June, 1937, Clarence R. Weimer and Doris Weimer, came from Wenatchee and invited deceased to visit with them at Wenatchee for a short time. That upon being informed by said Weimers that the weather was cool there, did go to Wenatchee with said Weimers.

"That on or about the 6th day of July, 1937, deceased suffered a severe heart illness and was taken to a hospital in Wenatchee by said Weimers, where he remained for two days, and was then moved to the Weimers' home. That deceased's health rapidly failed; that on or about July 20, 1937, at the home of said Weimers, deceased, and contrary to the terms of said contract, signed the instrument purported to be the will now on file in this cause. That on August 1, 1937, deceased died.

"That the estate of deceased amounts to approximately $50,000, that by the terms of said contract claimants are entitled to at least the sum of $35,000, and hereby make and file claim against the estate of deceased in the sum of $35,000."

Notice of rejection of this claim by the executor was served on the claimants and their attorney on or about February 16, 1938. This action to enforce the claim against the estate was begun on the following March 8th, the venue being laid in Pierce county.

The claimant alleged that the deceased had "agreed to will and devise unto these plaintiffs the bulk of his estate," in consideration of their agreement to leave Pasadena, California, and come to Tacoma and make a home for him; that they had performed their part of the contract; that they were informed and believed that the estate left by the decedent was of the value of fifty thousand dollars; and

"That by reason of deceased's failure to comply with the terms of said agreement set forth in paragraph IV hereof, plaintiffs have been damaged in the sum of $35,000.

"WHEREFORE, plaintiffs pray judgment against defendant and the estate of William J. Thompson, deceased, in the sum of $35,000, together with their costs to be taxed according to law."

Defendant demurred for want of facts, and moved for a change of venue to Chelan county, the county of his residence. The demurrer was overruled, and the change of venue denied. The defendant executor, feeling aggrieved by the ruling as to venue, applied to this court for a writ of prohibition (No. 27129). The writ was denied; and, in due course, the issues were made up and the matter came to trial before a court, sitting with a jury in an advisory capacity. After the evidence was taken, the following questions were submitted to the jury:

"(1) Did William J. Thompson while at Pasadena agree with the plaintiffs that in consideration of their providing a home for him at Tacoma and caring for him for the balance of his lifetime, that he would will to them the bulk of his estate except the land in Whitman county, and did the plaintiffs then agree so to do?

"(2) Did the plaintiffs fully and reasonably do and fully perform their part of such agreement by establishing such a home and complete their part of the agreement until he left for Wenatchee?"

The jury answered both questions in the affirmative, and the trial court, adopting its findings, ordered, adjudged, and decreed that the defendant, as executor, "distribute" to plaintiffs all of the assets owned by the deceased at the time of his death, except certain Whitman county lands, after paying the inheritance taxes on the property ordered to be delivered to the plaintiffs and the costs of administration. It was further ordered that the costs of defending this action be not

paid out of any of the property ordered "distributed" to the plaintiffs, and further, that the costs in the prohibition proceedings had in this court be not allowed as expenses of administration.

The defendant executor appealed, and, in so doing, assigns as error (1) that the court erred in awarding any of the property to the plaintiffs; (2) in ordering that Weimer, as executor, be not permitted to pay the costs of defending the action out of the property awarded to the plaintiffs; and (3) in ordering that the cost of the prohibition proceedings be not allowed as costs of administration.

The respondents have moved to dismiss the appeal, upon the authority of such cases as: *In re Cannons' Estate,* 18 Wash. 101, 50 Pac. 1021; *Cairns v. Donahey,* 59 Wash. 130, 109 Pac. 334; *In re Tucker's Estate,* 116 Wash. 475, 199 Pac. 765; *In re Maher's Estate,* 195 Wash. 126, 79 P. (2d) 984, and a great many other cases to the same effect decided in this and other jurisdictions. The rule of these cases is well stated in the case last above cited:

"The general rule is that an administrator [or executor], as such, cannot appeal from a decree of distribution determining the persons who should receive an estate, either as heirs at law of the decedent or as distributees under a will."

The decree in this case reads like a decree of distribution. The court orders the executor to "distribute," and speaks of the property as "distributed" to the plaintiffs. But it is in no sense a decree of distribution. The only persons to whom it purports to distribute anything are the plaintiffs. They are not distributees in the sense that word is used in the rule above quoted. The decree does not award them anything as heirs at law, nor does it make an award to them as legatees or devisees. They are not even mentioned in the will.

Furthermore, the action does not even purport to invoke the probate powers of the court. As will be noted from the final paragraph of the complaint, hereinbefore quoted, it is alleged that decedent breached a contract, and the prayer is for damages in the amount of thirty-five thousand dollars. By common consent of the court and the parties, apparently, the case was tried as an equity action wherein the plaintiffs sought to recover the property in specie.

The reasoning underlying the rule that an executor or administrator cannot appeal from a decree of distribution determining the persons who shall receive the estate, as is held in *In re Cannons' Estate, supra,* is that he has no right to take sides in any controversy between the distributees. Being bound to represent all of them impartially, he cannot be heard to urge the claims of one against another or others. But, in this case, it was the definite duty of the executor to take sides in the matter, since its object was to establish a claim against the estate.

"It is the duty of an executor or administrator to defend all suits that may be brought against the estate and to protect the estate from invalid and doubtful claims and obligations. He should interpose against such claims every legal objection that industry and care can furnish." 21 Am. Jur. 496, § 223.

Presumably, this duty would extend to taking an appeal from an adverse decision of the trial court where the executor had reasonable grounds to think the decision erroneous. However that may be, in the instant case it was clearly the duty of the executor to take an appeal; for the decree, which, as we have seen, was not a decree of distribution, but merely a decree in equity, directed him to turn over to the Thompsons all of the assets owned by the decedent at the time of his death, excepting only certain Whitman county

lands therein described. Among the assets which the decree thus ordered turned over to the Thompsons were forty shares of corporate stock bequeathed to Alice Eckersley. This bequest the executor was bound by his oath and his office to preserve and protect. Under the circumstances, he could only discharge that duty by taking an appeal.

The motion to dismiss is denied.

■ We come now to the merits. On the day this action was commenced, the defendant Weimer was the lawful executor of the will of the decedent, a will which had been admitted to probate six months before without contest or appeal and which, in terms, revoked all former wills. No portion of the property of the estate in the executor's hands had been bequeathed or devised to the respondents; yet they asserted that the "bulk" of it belonged to them by virtue of an oral contract which they had on their part performed, and prayed that the defendant be ordered to convey. They had no standing in law on account of the statute of frauds.

Equity, however, can grant relief in such a situation, but in a measure, equity follows the law, and, in the absence of a writing, will not grant relief unless the alleged oral contract be proven by "evidence that is conclusive, definite, certain, and beyond all legitimate controversy." *Resor v. Schaefer*, 193 Wash. 91, 74 P. (2d) 917.

Furthermore, such an action is essentially an action for the specific performance of a contract.

"One of the fundamental rules respecting the specific performance of contracts is that performance will not be decreed where the contract is not certain in its terms. The terms must be complete and free from doubt or ambiguity, and must make the precise act which is to be done clearly ascertainable." 25 R. C. L., Specific Performance, 218, § 17.

Every case based on an oral contract to devise, as is said in *Resor v. Schaefer, supra,* must rest on its own particular facts and circumstances. It, therefore, becomes necessary to review the evidence.

William J. Thompson and his wife came to Tacoma about 1908. The date of his wife's death is not shown, but it must have been, at least, prior to 1930. We have in the record a remarkably clear picture of his life from January 1, 1933, until May 15, 1937, for he kept a diary in which he carefully made an entry, in ink, every day of that period. These entries almost invariably gave the state of the weather. As a rule, they record the ups and downs of the stock and wheat markets. They record the state of his health, his financial transactions, particularly the items of income, and, yearly, his expenditures. They, apparently record every letter or postal card which he received, and every one that he wrote.

The plaintiff Clarence C. Thompson was a nephew of the decedent, and he is ordinarily designated in the diary as "C. C.," sometimes, "C. C. Thompson." His wife is designated as "Eva." Dora Weimer, wife of the defendant, was a daughter of the decedent's half-sister, and appears repeatedly in the diary as "Dora." The decedent visited the Weimers at Wenatchee from two days to two weeks every year for approximately thirty years prior to his death. He stayed with them almost two continuous years in 1930 and in 1931. The plaintiffs saw Thompson in 1930 and 1936. Clarence Thompson testified:

"We were here in 1930 at the time he was at Weimers and again in 1933 we came here to make a home here but conditions were not such that we could stay and we went back to Pasadena."

He further testified that decedent came to Pasadena to make his home with them in 1936, bringing all his

belongings that he could carry; that he had a very bad foot. Mrs. Thompson, a graduate nurse, dressed his foot, cleaned, pressed, and mended his clothes, and he was treated as one of the family. The weather, however, became hot, and this increased his already too high blood pressure.

Plaintiff Thompson testified that an agreement was made between decedent and himself at Pasadena, but he was not permitted to state its contents. The decedent went back to Tacoma. The plaintiff had financial obligations in Pasadena, and could not leave. On the following March 18th, about ten months later, the plaintiffs went to Clear Lake, California, and entered into a partnership with a man named Armstrong, to operate a market and cabin camp. As spring came, it became apparent that it would be too hot for the decedent to live there; besides, plaintiff got into difficulties with his partner. We quote from his cross-examination:

"Q. When you arrived at Clear Lake Highlands you were in pretty bad financial condition, weren't you? A. Yes, sir, I did not have too much money. Q. And didn't you have some difficulty there in Clear Lake because of the fact that you did not have enough money to proceed with the business venture? A. That was not the main difficulty; that would have been taken care of if other parts had worked out satisfactorily."

The plaintiffs left for Tacoma on June 3, 1937, with a hundred pounds of housekeeping effects in a trailer. Arriving at Tacoma, they procured a house on June 11th. They moved the decedent and his effects into the house on June 12th. He was not in good health. A doctor ordered him to stay in bed for four days. On June 29th, the Weimers came over from Wenatchee. They asked "uncle" to go back with them, assuring him that it was "nice and cool" over there. He went home with them on the 30th, and for the present we drop

the narrative to examine additional evidence as to the matters covered by the witness.

Mrs. Thompson's evidence was very similar to her husband's, although she put more stress upon his need of care. She said that, when the decedent had to leave Pasadena on account of the heat, they began to plan to get a cooler place to make a home for him. Ten months afterwards, they thought they had found it at Clear Lake, but, after they had been there for some months, the weather got hot and she knew he would not be able to stand it.

In May, they received a long letter from the decedent. It is the only one of his many letters which they produced at the trial. Evidently, it was in answer to a letter from them telling of their financial troubles and suggesting that they were thinking of coming to Tacoma. The letter is long. We quote those parts of it which might be thought to support the plaintiffs' case. After expressing his sorrow and indignation that "those people" had treated them so badly, he wrote:

"I suppose you got my letter before this. I suppose you got it the next day after you sent mine. Well, I am sending you a money order for $50. You spoke of your —riting while Clarence was in the store looking after some work and I thought *maby* you needed it. How I have wished that you might be living here that I might have a home—am tired of this rooming house business. If Clarence comes to Tacoma to look for work, I hope he can find it. I can't say what the prospects might be."

He then stated, generally, that there were lots of labor troubles and strikes in Tacoma, and that a considerable part of the population were living on old-age pensions; discussed the weather, made some inquiries about mutual acquaintances, and closed as follows:

"Well, I will close for this time. Hope everything will come out in the wash. So goodbye & good luck &

let me hear from you often, and don't be afraid to tell me your troubles at any time. With lots of love and best wishes. I think you have the mother present. With lots of XXXXX. I am feeling pretty good some days. By by."

In her testimony, Mrs. Thompson gave this letter a somewhat liberal interpretation. In speaking of Clear Lake, she said:

"When we first got there, it was quite nice but continued to get hot, and I knew he would not be able to stand it. He was really disappointed about that; he had pictured that lake, but after I told him about the conditions he sent me $50.00 and we knew what that was for and came here."

On June 3rd, they left for Tacoma. Perhaps, the most important part of Mrs. Thompson's testimony was the following:

"Q. What was the purpose of your coming to Tacoma after leaving Clear Lake? A. To make a home for him as I promised to do. Q. Was that in pursuance of any agreement you had had between yourself and him and your husband and Mr. Thompson? A. We had always promised to make a home for him, yes, sir."

The entries in the diary from February 26th to May 10th, 1936, the period which the decedent spent with the plaintiffs at Pasadena, indicate nothing more than an ordinary visit, during which the Thompsons were very kind to their guest and which he thoroughly enjoyed. He took long walks, long drives, went to picnics and dinners, visited friends, saw the "sights," and did the normal things that a visitor would do. There is no indication that he was in particularly bad health. On one day, he complains of hay fever, and on another, of a sore foot. One day he characterized as too cool to be pleasant; another, he says was too hot, but he made no especial complaint of the heat unless the following entry be so considered:

"April 11, 7:30 a. m. Maximum 91 yesterday, some hot, I'll be thinking of going north soon."

As indicating his condition of health during that period, we find an entry in his diary, made nearly a year after the Pasadena visit, which reads as follows:

"January 11, 1937, Monday: 8 a. m. Fine sunshine. First time I went to see a dr for over 30 years outside the time I was hurt. The kidnap boy was found."

Another, made about two and one-half months before his death, reads as follows:

"May 13, 1937: Thursday, five weeks since I seen the doctor."

Harvey Redcay, of Rosemead, California, testified, by deposition, in part, as follows:

"*Interrogatory No. 6:* State whether or not you had any conversation with William J. Thompson in the spring of 1936 relative to his future home and the disposition of his property upon his death. Yes, I had such conversation and he stated he intended to make his home with Eva & Clarence C. Thompson and that he intended to give the bulk of his estate to Eva and Clarence C. Thompson.

"*Interrogatory No. 7:* If your answer to the above question is yes, state when, or as nearly as you can, and where that or those conversations took place and in whose presence, if any. About first part March, 1936, at my home, 3141 Valley Blvd., Bassett, Calif., in the presence of my wife, Louise Redcay, and of Eva Thompson and Clarence C. Thompson.

"*Interrogatory No. 8:* State as nearly as you recall what he stated. That he had made out a will favor Eva Thompson and Clarence C. Thompson and that they would be comfortably taken care of the rest of their lives."

There is no evidence in the record of any such will.

Mrs. Redcay testified, by deposition, in part, as follows:

*"Interrogatory No. 6:* State whether or not you had any conversation with William J. Thompson in the spring of 1936 relative to his future home and the disposition of his property upon his death. Yes.

*"Interrogatory No. 7:* If your answer to the above question is yes, state when, or as nearly as you can, and where that or those conversations took place and in whose presence, if any. In the spring of 1936 at Pasadena, California. In the presence of: Clarence C. Thompson, Eva Thompson, Harry Redcay, Louise Redcay.

*"Interrogatory No. 8:* State as nearly as you recall what he stated. William J. *T*ompson stated that he desired Clarence *T*ompson and his wife to come to Tecoma, Washington, and live with him and make a home for him, and they would be well provided for in the future."

S. E. Johnstone, Clarence Thompson's Pasedena employer, testified, in part, as follows:

*"Interrogatory No. 15:* If your testimony is that Clarence C. Thompson left your employment or ceased business connections with you in Pasadena, state whether or not any declaration was made by Clarence C. Thompson at or shortly prior to the time of his leaving concerning what his future business intentions were. To the best of my information and belief he intended to engage in business for himself, or in partnership with a Mr. William Armstrong at Clear Lake, California.

*"Interrogatory No. 16:* If your answer to the above interrogatory is that Clarence C. Thompson did make declarations to you as to what his future business intentions were shortly prior or at the time of ceasing connections with you, state what declarations he made in that particular. Expectations were to engage in business with the said Mr. Armstrong, at Clear Lake, California, or to live with and care for said above mentioned uncle."

The defendants contended that the plaintiffs adopted the second alternative and went to Clear Lake, and,

relying upon the evidence of William Armstrong, the partner in the business conducted there, further contend that the fact that Armstrong dissolved the partnership about May 1st was the real reason the plaintiffs left Clear Lake and went to Tacoma.

Mr. Van Pelt testified that he sold certain stocks to the decedent in 1936 and 1937, and decedent mailed them to the Thompsons. Decedent said he was buying them "for my children in California." When urged to buy more, decedent declined to do so, saying that they would get the benefits later, which witness took as an intimation that the decedent intended to leave them his property. Decedent said nothing about living with the Thompsons. These purchases, it developed upon cross-examination, amounted to more than three thousand dollars. That the decedent did buy certain stocks and send them to Clarence Thompson is confirmed by entries in the diary.

Mr. McNall, an old friend often mentioned in the diary, testified that he asked decedent, late in 1936 or early in 1937, why he did not go to California. He replied that, if he didn't go to California, his folks would come up anyway.

"I said, How is your nephew getting along, and he said, Well, he is working part of the time, of course, but after I am done he has nothing to worry about; he will have plenty after I am done."

The witness testified that this conversation took place when the elder Thompson was negotiating with the Fisher Flour Mills for the sale of his wheat. The diary fixes that date as February 21, 1937.

Mrs. McNall testified that the decedent told her that the young Thompsons were coming up from California, and that he planned to make his home with them and seemed quite happy, but that she never heard him say anything about the disposition of his property.

D. B. Ballard, an old gentleman who had lived at the Park Hotel ever since it was built, testified that the *last* time that he talked with the decedent was when he came back from California, and he then said his relatives were coming up to make a home for him. In the next breath, he testified that he talked with him a week or two before they arrived, and he said that they were coming, and that he was in good spirits.

Alice Eckersley, a nurse who cared for an elderly man who lived at the Park Hotel and, as the diary shows, sometimes looked after the decedent as well, testified, in part, as follows:

"Q. How did he express himself as to the treatment he had received at the hands of the Thompsons down there? A. I used to go up there and he was filled with joy as to the prospects and how they had treated him and thought he had never known such kindness as he had received from them. Q. Did he at that time or subsequently tell you anything as to future prospects for a home? A. Yes, sir, he said he was going to stay with them. He frequently said he would be so happy when they would be here. He had got to an age when he did not want to live alone and what wonderful care Eva took of him in an emergency once; what she could do for him and spoke of the advantages of their being with him and that she could care for him. Q. But he said they were not financially able to come? A. He said that, but said they would not have to worry, for I have got property; but he said he thought it better for people to have hardships, and then later on they would appreciate it. Q. Do you recall when he received a letter from the Thompsons that they were coming here? A. Yes; he was very much disappointed. He loved parks and so forth, and was disappointed when they said they could not stay at Clear Lake, but they would have a nice home here and that he intended to buy that home for them. Q. Was he disappointed at the Thompsons coming here? A. Oh, no; he was disappointed at not being able to live around that lake as they had said it was too hot for him."

We return now to the narrative, although what happened after the Weimers took the decedent to Wenatchee on June 30th is largely immaterial.

On July 11, 1937, Mrs. Weimer wrote a letter to the Thompsons purporting to report on the decedent's condition. Concerning the matter, the letter said:

"Uncle sits under the trees and rests as much as he can. He seems better in some respects, and about the same in others. He felt pretty good yesterday and looked fine, but walked around quite a little and got a bit tired, I think."

The facts are that he had been so ill that a doctor had been called in only five days before, and, finding him a very sick man, removed him to a hospital and kept him there for two days, July 6th and 7th.

The will leaving the whole estate to the Weimers, except the small bequest to Alice Eckersley, was executed on July 20th. It was made on a printed form. An enlarged photostat of the decedent's signature is in the record. The signature is not on the blank line prepared for its reception, but straggles along, in a most irregular fashion, across the printing above. It is scarcely legible. The surname appears to read "Thompoo."

Two days after the will was executed, Mr. Weimer appeared in Tacoma with the authority to enter the decedent's safety deposit box, and, having done so, took therefrom all of its contents. At this time, according to plaintiff Thompson, Weimer told him that the decedent could not live twenty-four hours, and that he had been to an undertaking parlor to make funeral arrangements. He said nothing about the will. There is evidence that Mr. Thompson wanted Weimer to take his wife over to Wenatchee on his return trip. Mr. Weimer admitted to consulting the undertaker; said he told Thompson that the doctors would probably not

give the decedent twenty-four hours to live; denied that Thompson had requested him to take Mrs. Thompson to Wenatchee, but admitted that he said that it was better that she was not over there.

Mrs. Thompson went over on the bus that night. She did not see the decedent until the next morning, when she was conducted into his room by Mrs. Weimer. He recognized, and talked with, her briefly. According to her testimony, she was thereafter excluded from his room, on the ground that the physician's orders were to exclude strangers. Mrs. Weimer denied that Mrs. Thompson was excluded, saying that she was admitted several times and until the decedent himself requested that she be not admitted. On the day of the funeral, Weimer told the Thompsons of the will, and that everything had been left to them.

After the filing of the claim upon which this action is founded, and after the commencement of the action itself, counsel for plaintiffs, shrewdly suspecting, from a somewhat cryptic entry in the diary, that a former will had been executed on May 29, 1936, and, knowing that the defendant had entry to decedent's safety deposit box on July 22, 1937, proposed to defendant the following interrogatory, to be answered on oath:

"Was there in said box a will of William J. Thompson dated on or about May 29, 1936?"

This brought to light on June 3, 1938, that, on the previous July 22nd, Weimer had found, in the decedent's safety deposit box, a will duly executed by the decedent on May 29, 1936, shortly after his return from the Pasadena visit. In this will, decedent had bequeathed to "my niece Dora M. Weimer" the farm in Whitman county, and all the remainder and residue of the property "to my nephew Clarence C. Thompson," and nominated Thompson as his nonintervention ex-

ecutor. It does not appear that the plaintiffs amended their pleadings after their discovery of this will, either before or during the trial.

While the fact that decedent made such a will on May 29, 1936, so soon after his return from Pasadena, is material in this inquiry, the evidence as to the things which occurred after the decedent came under the direct influence of the Weimers is of very little materiality. Doubtless, it had its effect on the jury, but the fact that that evidence would have furnished plausible grounds for a will contest, timely made, does not entitle it to consideration in this case. The will of July 20th cannot, in this case, be impeached or disregarded. In fact, the theory of this case is that the will carried the title to decedent's property into the hands of the executor. This is an action to force him to convey.

From the foregoing, it appears (1) that the plaintiffs filed a claim, alleging that the decedent "agreed to devise unto claimants the bulk of his property;" (2) that they filed an action in contract, alleging that the decedent "agreed to will and devise unto these plaintiffs the bulk of his estate;" (3) that, although no amendments were made, the court put the question to the jury, "Did William J. Thompson . . . agree with the plaintiffs . . . that he would will to them the bulk of his estate, except the land in Whitman county . . . ?" and (4) the jury having answered in the affirmative, the court went even further and awarded the plaintiffs *all* of the estate, except the land in Whitman county.

If the plaintiffs had proven the contract alleged, it would seem that the court could not have enforced it. What is the "bulk" of an estate? Evidently, it is more than half, but is it fifty-one, or sixty, or seventy-five, or ninety per cent, or some other percentage thereof?

But we need not decide that question. It is clear that the decree appealed from does not purport to enforce the contract set up in the claim and alleged in the complaint, because it awards to the Thompsons less than half of the estate, the portion awarded to them being appraised at $8,034.75, while the land which the court permitted the executor to retain was appraised at $9,950.

Apparently, the court accepted the will made on May 29, 1936, as evidence establishing, not only that a contract to devise had been made, but also establishing its terms. It is said in *Worden v. Worden,* 96 Wash. 592, 165 Pac. 501:

"A case of this kind would not require the same degree of convincing evidence as those cases where no will had been made in conformity with an alleged oral contract."

But, in the instant case, the will made on May 29, 1936, is not in conformity with the alleged oral contract, for there is nothing in the record which shows that the property therein bequeathed to Clarence C. Thompson was the bulk of the estate. On August 1, 1938, it was clearly less than half the estate, for it was appraised at $8,034.75, while the Whitman county lands were appraised at $9,950. Furthermore, we are satisfied, from the income entries in the diary, that the disparity was even greater in May, 1936.

We find nothing in the record which leads us to conclude or infer that the will of May 29, 1936, was made pursuant to, and in accordance with, a preexisting contract or contracts. On the other hand, we think substantially all the reasonable inferences are to the contrary. At the time that will was made, both C. C. Thompson and Dora Weimer were the natural objects of the elder Thompson's bounty. With Mrs. Weimer, he had maintained close and friendly relations for

more than thirty years. Clarence Thompson he had not seen so often, but he had just concluded an extended and most happy visit with him and his wife at Pasadena. But busy as he was there, he did not wholly neglect Dora Weimer; nor did she forget to remember him. During that period, and thereafter, as the diary shows, their correspondence was maintained as usual.

The will was made on May 29th. Decedent had written to both on May 19th. He wrote to Eva Thompson on June 21st and July 8th, to Dora Weimer on June 22nd and July 2nd. Under these circumstances, is there anything so unusual or surprising in the fact that the decedent devised and bequeathed nearly half of his property to his nephew as to compel or even justify an inference that this must have been done in pursuance of a preexisting oral contract? The record is replete with proof of his affectionate regard for the Thompsons. Is that not of itself sufficient to account for the fact that he left the husband nearly half of his property just a few days after returning from a most enjoyable visit with him and his wife? The provisions of the will of May 29, 1936, dividing the property nearly equally between nephew and niece, are so thoroughly those which one would naturally expect, under the circumstances shown, that any inference that the will was made to carry out the contract alleged, or any other, is wholly gratuitous.

To conclude: There is evidence in this case which would have warranted, at least, a very strong suspicion of undue influence on the part of the Weimers had a contest of the will been timely made, but the respondents completely failed to establish (1) a contract to devise the bulk of the estate, or (2) the bulk of the estate except the Whitman county lands, or (3) all the estate except the Whitman county lands, with that certainty required by the rules governing the enforce-

ment of oral contracts to devise. *Resor v. Schaefer*, 193 Wash. 91, 74 P. (2d) 917; *Wayman v. Miller*, 195 Wash. 457, 81 P. (2d) 501, and the numerous cases therein cited. Had they established the contract, it is doubtful whether the evidence of performance on their part could be considered sufficient.

The judgment and decree appealed from is reversed.

ALL CONCUR.

