504

CLARENCE KEYS, *Appellant,* v. CAROLINE KLITTEN, *Respondent.*[1]

*Horrigan & Horrigan, Karl J. Grimm,* and *Ivan Merrick,* for appellant.

*Stephen E. Chaffee* and *B. E. McGregor,* for respondent.

JEFFERS, J.—This action was instituted by Clarence Keys against Caroline Klitten, in the superior court for Benton county, for the purpose, as stated by plaintiff in his brief, of compelling specific performance of what is termed an

[1]Reported in 151 P. (2d) 989.

"earnest money receipt," executed by the parties hereto on May 6, 1943, and for an accounting by defendant of the profits, resulting from the operation of the hotel property described in the receipt, from May 6, 1943. While plaintiff, in his brief, contends that the action was based upon the earnest money receipt, the trial court was of the opinion that the action was based not only upon such receipt, but also on what will be referred to as the Powell lease.

The complaint alleged, in substance, that defendant, on May 6, 1943, was the owner and in possession of the Kennewick Hotel, its furnishings, and equipment, at Kennewick, Washington; that on that date the parties entered into the following written agreement:

"EARNEST MONEY RECEIPT

"For and in consideration of $500.00 this day paid to the undersigned, Caroline Klitten, she hereby agrees as follows:

"That she will sell to Clarence Keys all of the furniture, fixtures and equipment used in the Kennewick Hotel, consisting of carpets, beds, bedding, mattresses, room furniture, linen, dining room fixtures, kitchen equipment, dishes and all other fixtures and equipment used in connection with the Kennewick Hotel, located on Lots 1, 2, 3 and 4 and 5, Block 9, Amon's Addition to Kennewick, Benton County, Washington (except all plumbing and lighting fixtures).

"The undersigned agrees to sell said furniture, fixtures and equipment for $10,000, payable as follows:

"$4,000.00 in cash, and the balance of $6,000.00 at the rate of $300.00 per quarter, with interest at 4% per annum, payable with each installment. The unpaid balance will be secured by chattel mortgage, which will also secure the payment of the last three months' rental in the lease hereinafter referred to.

"In further consideration for the earnest money this day paid the undersigned agrees that she will execute a lease to Clarence Keys for five years for the above described real property and improvements thereon, consisting of the hotel building, for $375.00 per month, payable monthly in advance, reserving, however, to herself the rental upon the office space located on the east side of said building on the ground floor, she to agree, however, not to rent said space to any person who might be in competition with the purchaser and lessee in the operation of a club or in the hotel or restaurant business.

"The undersigned further agrees that she will vacate her apartment by July 1, 1943, and will allow a credit of $15.00 a month rental until she vacates the same. All fixtures and equipment in said apartment may be removed by her with the exception of hotel equipment now stored in said apartment.

"Immediately upon completion of proper bill of sale, chattel mortgage and lease, the undersigned agrees that she will execute the same and surrender possession, and that the earnest money this day paid will be applied upon the total consideration to be expressed therein.

"Dated this 6th day of May, 1943.

"CAROLINE KLITTEN

[Acknowledgment]

"It is agreed that if the undersigned does not pay balance of consideration and execute lease and chattel mortgage that the earnest money provided herein will be forfeited to the owner, Caroline Klitten.

"Dated May 6, 1943.                    CLARENCE KEYS."

It is further alleged that, in accordance with this agreement, plaintiff paid to defendant the sum of five hundred dollars, and ever since has been able, ready, and willing to pay defendant the sum of four thousand dollars, and has been able and willing to comply with all the terms and conditions of the agreement, has fully performed all the conditions of the agreement on his part to be performed, and is and has been at all times willing to accept a lease of the premises in accordance with the terms of the agreement.

Paragraph five of the complaint, which the trial court considered material to a determination of the basis of plaintiff's cause of action, states:

"That the defendant had a lease drawn by her attorneys [the Powell lease] and submitted it to the plaintiff. That the plaintiff informed the defendant that the said lease was acceptable to him and which lease the plaintiff offered to execute, but the defendant refused to execute the same or any lease whatever. That the defendant also had her attorney prepare a mortgage covering the furniture and fixtures of the said hotel Kennewick, which mortgage was submitted to the plaintiff by the defendant's attorney; that the said mortgage was acceptable to the plaintiff and plaintiff offered to execute the same."

It is further alleged that defendant stated to plaintiff that she would not perform any of the conditions of the earnest money receipt, and that she had repudiated the entire transaction.

Defendant, by her answer, admitted that she signed the earnest money receipt, but denied the other material allegations of the complaint.

As a first affirmative defense, defendant alleged that, after the agreement was signed, but prior to its delivery, it was agreed between the parties that the lease and sale of the personal property would be on terms and conditions satisfactory to defendant. It is further alleged that plaintiff, without consulting defendant, caused the Powell lease, a bill of sale, chattel mortgage, and note to be prepared, and that these instruments, as prepared, especially the lease, were not satisfactory to defendant.

It is further alleged that, owing to the fact that the parties could not agree on the terms of the lease, the parties did not further negotiate, but mutually agreed to cancel and rescind the earnest money receipt.

Plaintiff by his reply denied the affirmative matter contained in defendant's answer not admitted by the complaint.

The cause came on for hearing before the court on November 29, 1943, and thereafter, December 7, 1943, the court entered judgment dismissing plaintiff's cause of action with prejudice. Plaintiff gave timely notice of appeal to this court from the judgment.

While appellant has made some eleven assignments of error, we shall refer to only four of them, which we think raise the questions necessary for a determination of this action. These assignments are that the trial court erred in refusing to grant specific performance of the agreement of May 6, 1943; in refusing to order an accounting to appellant for profits earned subsequent to May 6, 1943; in denying appellant's motion to reopen the case for additional evidence; and in refusing to dismiss the case without prejudice.

While respondent in her brief refers to the extensive findings of fact and conclusions of law found in the statement

of facts, pages 145 to 157, there are no findings of fact or conclusions of law so denominated, and, of course, it was not necessary that there be any in this type of case. What respondent refers to is the memorandum decision made by the trial court. This memorandum opinion is quite complete, and undoubtedly indicates the court's view of the facts and the conclusions reached by it from the facts. We are of the opinion that the following statement from the memorandum decision shows the trial court's theory of the case and its reason for not requiring respondent to perform specifically the conditions of the earnest money receipt:

"Now, didn't Keys elect to stand on the Powell lease? He too, can only blow hot and cold up to a certain point. He stood fast on the Powell lease, threatened to sue her unless she signed it, and the next day started a suit. Now, shouldn't he, and isn't he bound in view of that contention to say to her, 'All right, Mrs. Klitten, you get an attorney, or I will, and we will have him take that earnest money agreement and not put a thing in it [the lease] but what is in that earnest money agreement, then you have to sign that or I will sue you'—a totally different case. He made no demands of that kind. His demand was 'You sign the Powell lease or I will sue you.' She didn't have to sign the Powell lease. She had no chance before the suit was brought against her to make any tender of any lease because she didn't know when he [appellant] left whether he was going to sue or whether he was going to accept the $500 [the amount paid down by appellant at the time the earnest money receipt was signed] and she went to the bank and put it back."

The trial court did not specifically decide whether or not the earnest money receipt was sufficiently specific and definite, in so far as the terms of the lease which was to be prepared were concerned, to permit specific performance of the earnest money receipt, although the memorandum opinion seems to assume that it was. Of course, it was not necessary that the trial court so decide, because, in reaching the conclusion which it did, the court could assume that, while appellant might be entitled to specific performance according to the terms and conditions of the earnest money receipt, the Powell lease, which the court stated appellant

was at all times insisting that respondent sign, contained terms and conditions not in accordance with the receipt, and upon respondent's refusal to sign the Powell lease, appellant immediately brought this action.

As indicated at the beginning of this opinion, appellant contends in his brief that he is not asking that respondent be required to sign the Powell lease, but only that she be required to execute a lease according to the terms and conditions of the earnest money receipt.

The testimony in this case is absolutely in conflict on some of the material questions. After reading the record, we can appreciate the difficulty which confronted the trial court. We shall endeavor to set out the testimony which we consider material to a determination of the cause.

Appellant Keys had been rooming at the Kennewick Hotel for a short time prior to May 6, 1943. During this time respondent had talked to him about buying the hotel. Apparently appellant was not in a position to buy, or was not interested in buying, the hotel, and so informed respondent. As a result of these conversations, respondent stated to appellant that she would lease him the hotel building and sell him the furnishings and equipment, and a tentative agreement was reached by the parties. Pursuant to such tentative agreement, appellant, on May 6, 1943, went to see Mr. Powell, an attorney of Kennewick, about the matter. Appellant stated that he went to see Mr. Powell at respondent's suggestion, but this was denied by the latter. Appellant talked to Mr. Powell, and, as the result of such conversation and upon information furnished by appellant, Powell prepared the earnest money receipt. After the receipt was prepared, Mr. Powell took it to the hotel, and there the parties to this action and Mr. Powell discussed the terms of the receipt and the papers mentioned therein, which were to be prepared and executed to close the deal.

According to Mr. Powell's testimony, it appears that some of the terms of the lease to be drawn were discussed both before and after the earnest money receipt was signed. It does not appear definitely just what terms and conditions

of the proposed lease were discussed, but, according to Mr. Powell, respondent was particularly anxious that her interests be protected. Mr. Powell further stated that it was not agreed that the parties should be bound to accept any lease he might prepare, at least if it did not conform to the terms of the earnest money receipt, but it seemed to be his understanding that the parties would have the right to suggest additional provisions which they might consider necessary to protect their interests.

The parties signed the earnest money receipt, and appellant paid respondent five hundred dollars. The next day, which was Friday, May 7th, Mr. Powell prepared the lease known and referred to herein as the Powell lease. Undoubtedly, Mr. Powell, in preparing this lease, put in provisions which he thought would be acceptable to the parties, based upon the discussion of the previous day, but there is no question but that the proposed lease contains several provisions at least not referred to in the earnest money receipt, and which could not be classed as usual provisions, and which might with reason be objectionable to respondent. One such provision is the following:

"The lessor agrees that she will keep the improvements on the real property insured against loss or damage by fire, and will immediately cause any loss or damage to the premises to be repaired, or any portion of the premises to be repaired or rebuilt within a reasonable time after such damage and destruction, provided, however, that in the event of a total destruction of the premises or damage to the major portion of said building so that the same cannot be rebuilt within a reasonable time, then this lease shall terminate at the option of the lessor."

While the above provision is undoubtedly quite a common provision, it does place a financial obligation upon respondent which she did not agree to assume under the earnest money receipt. Mrs. Klitten did not agree in the earnest money receipt either to insure or to repair.

Here is another provision found in the Powell lease, not mentioned or referred to in the earnest money receipt:

"In the event of any damage or destruction to the improvements on the premises the rental for the portion of

said building so damaged or destroyed shall immediately abate and the lessees shall not be obligated to pay rental on the building, or portion thereof, until the same is again ready for occupancy."

Again, while the above provision is fair, and one which a tenant might well insist upon being in a lease, such provision was not referred to in the earnest money receipt, and in the absence of an agreement so to do, respondent cannot be compelled to sign a lease containing such a provision.

We cite another provision of the lease not referred to in the receipt:

"The lessor agrees that she will keep and maintain the exterior of the building in a reasonable condition and state of repair and will repair or replace the roof thereof when she is notified of any necessity therefor."

This, perhaps, is also a reasonable provision to be required on the part of a lessee, but such provision was not mentioned in the earnest money receipt, nor did respondent agree to it.

We call attention to another provision of the Powell lease not referred to in the receipt or agreed to by respondent:

"The lessor will not be liable for any damage to any of the property of the lessees in the building which shall result from failure to maintain the roof or exterior of the building, except such as may result after she has been notified of the necessity for such repair and has been given a reasonable time to complete the same."

The above is undoubtedly a good provision for a lessee, but it might result in placing upon a lessor a very serious financial obligation, and one which a lessor was not willing to assume.

Mr. Powell also prepared a bill of sale to be signed by respondent, and a note and chattel mortgage to be signed by appellant.

Respondent was not present when the above papers were prepared, and did not see them until they were left at the hotel late in the afternoon of the 7th. Appellant, when questioned about some of the provisions of the proposed lease, stated that he did not ask Mr. Powell to put them in

the lease, and did not know whether or not respondent did. Respondent's testimony is to the effect that she had nothing to do with the drawing of the papers, and did not know they had been prepared until they were left at the hotel; that she was never satisfied with the terms of the Powell lease, and always objected thereto.

Appellant was out of town at the time the papers were left with respondent, but returned on Sunday. He stated that he talked with respondent about them, and that she was entirely satisfied with them, and never indicated but that she was willing to sign the lease and bill of sale, until a few days later when she talked with Mr. McGregor, an attorney of Prosser. We shall refer again to the McGregor incident. Notwithstanding appellant's statement, it appears quite conclusively that respondent was not satisfied with the lease.

After the papers were left with respondent, she asked a Mr. Fuller to look at them. Mr. Fuller was not an attorney, but an engineer employed on the Hanford project. He made some examination of the papers, and then asked respondent if she had an attorney, and, upon being informed that she did not, he advised her to consult a lawyer. Mr. Fuller stated that the following day, at respondent's request, he went with her to the office of Mr. Moulton, an attorney of Kennewick, who, incidentally, is a partner of Mr. Powell; that Mr. Moulton, after examining the papers, advised respondent not to sign them. Mr. Moulton denied that he told respondent not to sign the lease and bill of sale, but it seems to be admitted that he told her that if she signed these papers she would be in for trouble, probably because she was not selling for cash.

The McGregor incident occurred sometime between May 7th and 11th. Mr. McGregor was in the hotel, waiting for a bus, when respondent, who knew him, asked him if he would look at some papers she had, stating that she was not satisfied with the proposed lease. About this time appellant came into the hotel, and respondent, appellant, and Mr. McGregor went into the dining room. Testifying concern-

ing this meeting, Mr. McGregor stated that he started to examine the lease, and they would discuss the different paragraphs as he read them; that the parties seemed unable to agree on any of the paragraphs he read; that, while they were discussing the lease, appellant said:

" 'I have got $100 in my pocket for anybody that can point out anything in that lease that isn't fair and upright or above-board.' "

The witness continued:

" . . . or something like that, and I think we went on and did some discussing of the terms after that. He [appellant] seemed quite nervous and excited about it and was insisting upon that lease just as it was, as though the terms were right and she should accept them."

Mr. McGregor then suggested that the parties sit down and see if they could not agree on terms and conditions which would be acceptable, but the parties did not indicate a desire to do this. The witness then suggested that respondent sell the hotel to appellant, and respondent stated that she would sell, but appellant did not have the money.

About this time, as appears by Mr. McGregor's testimony, respondent stated: "Well, why not call the whole thing off," to which appellant replied, "Well, hand my money back," and respondent stated that she would go to the bank and leave the money for appellant, or words to that effect.

Mr. McGregor further stated that there seemed to be nothing further to do, and so he suggested to respondent that, if she wanted to sell the hotel and would have it appraised, he, McGregor, could send someone to her who would buy it. The meeting then broke up, Mrs. Klitten going back to her desk, and McGregor going out to the lobby. While McGregor was in the lobby, appellant came up to him and made some angry remark.

Respondent's version of what happened after the discussion referred to by Mr. McGregor was as follows:

"Q. What, if any—after you had been arguing back and forth and couldn't agree, what, if any, statement did you make and what, if any, statement did Mr. Keys make?

A. I says, 'It looks impossible, the whole thing,' and I says, 'Let's call the thing off and quit this,' and Mr. Keys says, 'If I get my money back,' and I said, 'You sure can have your money, come down to the bank with me and you can have every penny.' ''

It appears that respondent did go to the bank, or at least made provision for the bank to pay to appellant the five hundred dollars he had paid her. It further appears that appellant was informed by an officer of the bank that the money was there for him, but appellant did not call for it.

Appellant's statement of what took place following the reading of the lease by Mr. McGregor is as follows:

"Q. Then what occurred? A. Mr. McGregor had finished reading the lease and he turns to her and he said, 'You shouldn't lease this building, you should sell it to me.' She says, 'What will you give me for it?' and he said, 'What is your price?' I believe she said $63,000 or $65,000 and he said, 'That is too much. Let's have it appraised and will you take the appraisement price for it?', and I don't remember the answer, and she said, 'Mr. Keys, I don't want to deal with you, I want to sell this building to Mr. McGregor.' I said, 'Well, you have already agreed to sell, to lease it to me,' and she said, 'I want to sell it and get rid of it.' She said, 'I will give you your money back,' and I said, '*I'll see*,' and I walked in the dining room and they were in there five or six minutes after I left." (Italics ours.)

Appellant further stated that, after Mr. McGregor returned to the lobby, and in the presence of respondent, appellant walked over to McGregor and stated:

" 'If you think you are so smart'—only I brought another word in—'maybe you want to defend her in this case. I am going to take it to court,' and he popped off something else and started to get up and I told him to sit back down and he did. I started up to my room and she [respondent] said, 'I will give you your money back,' and I said, 'I will take it to court, you and I.' ''

Immediately after the above occurred, appellant went to Pasco and consulted Mr. Grimm.

On cross-examination, appellant stated that all the provisions of the lease had been agreed upon between him and

respondent. He further testified, when asked what he said when respondent told him she would give him back the five hundred dollars: *"I told her I would see."* (Italics ours.) Appellant, after the McGregor meeting, did not talk with respondent again about a lease.

In concluding the cross-examination of appellant, the following questions were asked and answers given:

"Q. If you signed a lease containing just what is in this earnest money receipt, would it cover the agreement that you had with Mrs. Klitten in connection with the terms of the lease? A. Well, as far as—(Objection by Mr. Horrigan) THE COURT: Well, no, he is asking if it would cover the terms and conditions of the lease. A. Yes, it would, if I signed a lease according to this earnest money agreement. Q. Well, then these provisions that I read to you, I believe you said they had been agreed upon between you and her as a part of the lease? A. Yes, that's right. Q. Do you contend that all these agreements in this proposed lease are embodied in this earnest money receipt? A. *Well, no, I wouldn't say so.* It goes into more details in the lease than it does in the earnest money contract. There might be some things in there that don't amount to anything. The lease goes into more details. Q. I believe you said the lease covers what you had ultimately agreed between yourself and Mrs. Klitten? A. Yes." (Italics ours.)

The following statement made by appellant when he was testifying relative to his tender of $4,250 into court is quite convincing of the fact that appellant's complaint was based upon respondent's failure to sign the Powell lease:

"Now referring to this exhibit 4 on the part of the plaintiff, you say that $750.00 of that sum is to represent payment of rental? A. Two months in advance. Q. And was that to be paid as rental upon the proposed lease, defendant's exhibit 1, that I hand you? A. The question is, was this money supposed to be paid as rent in advance according to this agreement? Q. Yes. A. Well, I suppose it is in there. It is hers and my agreement, anyway. Q. But you were paying that rent on this lease? A. If that is what it is for. Q. That is what you tendered it in court for? A. $3500.00 is payment for the personal property, and $750.00 for two months rent in advance. THE COURT: The question is, were you tendering that in court under the

terms and conditions of that *particular lease* [Powell lease]? A. Yes, sir. Q. (By Mr. Chaffee) Were you tendering it in court under the terms and conditions of the chattel mortgage and note, which is offered in evidence? A. I was."

Counsel for appellant stated at the close of the testimony that appellant was not maintaining the action to require respondent to sign the Powell lease, but that appellant was seeking to enforce his rights under the earnest money receipt, and that appellant is now and has at all times been ready and willing to sign a lease embodying only the terms set out in the earnest money receipt.

■ Assuming that the earnest money receipt was sufficiently specific and definite as to the terms of the lease to be prepared to warrant a court of equity in requiring respondent to execute a lease in accordance with the terms and conditions of the receipt, we are of the opinion the trial court was justified in concluding that, under the facts in this case, appellant, at all times prior to the institution of this action, was insisting that respondent sign the Powell lease; that the Powell lease contained provisions not embodied in the earnest money receipt and not agreed to; and that, upon the refusal of respondent to sign the Powell lease, appellant, the same day, consulted an attorney, and the next day started suit.

The only lease which was discussed or considered by the parties was the Powell lease. This instrument is referred to in the complaint as having been prepared by respondent's attorney, but the facts which the court was entitled to consider do not bear out this statement. At most it could not be said that Mr. Powell was acting for respondent more than he was for appellant. We do not deem it necessary to discuss the provisions of the Powell lease which are not in accord with the provisions of the earnest money receipt, other than as hereinbefore set out; suffice it to say that it is apparent there are several such provisions. It is apparent to us that Mr. Powell in drawing this lease could not have considered that the provisions of the lease must be limited to those contained in the earnest money receipt, but was governed by what he thought the parties

wanted in the lease, or what he thought had been agreed to.

It may be admitted that decisions can be found where courts have decreed specific performance of a contract for lease or other instrument, even though the contract did not describe in detail all the conditions and provisions of the instrument to be later drawn and executed. However, we think the courts have gone no further than to enforce such contracts for lease where the contract contains a definite statement of the particular elements of the lease, but is silent as to the general, usual, and ordinary covenants and conditions. In such cases some courts have held that these usual and ordinary covenants would be implied, and have granted specific performance of the contract. See *Bennett v. Moon,* 110 Neb. 692, 194 N. W. 802, 31 A. L. R. 495.

The Powell lease contained covenants which could not be considered usual and ordinary, but were covenants to which respondent could properly object unless she had agreed to them.

Under this state of the record, we are of the opinion that the trial court was justified in dismissing the action. It might be questioned whether the trial court, under its theory, should have dismissed the action with prejudice.

■ While the trial court did not find it necessary, under its theory, to decide the question of whether or not the earnest money receipt could be specifically enforced, the question was before that court and is before us, and we have decided to pass upon it.

There can be no question but that the earnest money receipt, by its language, contemplated that additional papers, namely, a lease, etc., would have to be prepared and executed before the deal could be closed; in other words, the receipt is a contract for a lease, bill of sale, etc. While the receipt contains this provision:

"In further consideration for the earnest money this day paid the undersigned agrees that she will execute a lease to Clarence Keys for five years for the above described real property and improvements thereon, consisting of the hotel building, for $375.00 per month, payable monthly in advance, reserving, however, to herself the rental upon the

office space located on the east side of said building on the ground floor, she to agree, however, not to rent said space to any person who might be in competition with the purchaser and lessee in the operation of a club or in the hotel or restaurant business,"

it also contains the following:

"Immediately upon completion of *proper* bill of sale, chattel mortgage and lease, the undersigned agrees that she will execute the same and surrender possession, and that the earnest money this day paid will be applied upon the total consideration to be expressed therein." (Italics ours.)

What would be a *proper* lease? It must, we think, be admitted that an answer to the question might depend upon many circumstances and conditions; in other words, *proper* is not a word which does or could indicate the particular terms and conditions which were to be incorporated into the lease to be prepared; at least in the absence of testimony as to the meaning of the term *proper lease.* Neither would it seem that the term *proper lease* meant a lease in accordance with the terms and conditions of the receipt, for had that been the intent of the parties, it would have been easy to say that a lease should be prepared which would embody the terms of the earnest money receipt, as was done in the case of *Omak Realty Inv. Co. v. Dewey,* 129 Wash. 385, 225 Pac. 236.

No time was fixed as to when the proposed lease should begin to run, except that, when a proper bill of sale, chattel mortgage, and lease should have been prepared, respondent agreed to execute them and surrender possession.

We are of the opinion that it appears quite conclusively from the testimony of respondent and Mr. Powell, and even from the testimony of appellant himself, that it was not intended to restrict the conditions and provisions of the lease to be drawn to those contained in the earnest money receipt. The lease itself, as drawn by Mr. Powell, indicates to us that he could not have considered that it was intended by the term *proper lease* to limit the conditions and provisions of the lease to those contained in the earnest money receipt. It does indicate that Mr. Powell believed that the

lease contained conditions and provisions agreed to by the parties.

It is apparent to us from the testimony that it was not intended by the earnest money receipt to fix the terms and conditions of the lease, and it is just as apparent that the parties are unable to agree on the terms and conditions of such lease. In order, then, specifically to enforce this earnest money receipt, it would first be necessary for us to determine what terms and conditions should be included in a proper lease. To do this would, in our opinion, be writing a lease, the terms and conditions of which were not covered by the earnest money receipt, and upon which the minds of the parties had never met. This, a court of equity will not do.

To paraphrase a statement found in *Weldon v. Degan*, 86 Wash. 442, 446, 150 Pac. 1184, the earnest money receipt is no more than an agreement for a lease, or, in other words, an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete, and to which either of the parties might object if proposed. A contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations. 6 R. C. L., p. 617, § 38. In order for a court of equity to decree specific performance of a contract, the court must be able to determine what must be done to constitute performance. The indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act which is to be done clearly ascertainable. 49 Am. Jur. 34, § 22.

In *Thompson v. Weimer*, 1 Wn. (2d) 145, 95 P. (2d) 772, we quoted with approval from 25 R. C. L. 218, Specific Performance, § 17:

" 'One of the fundamental rules respecting the specific performance of contracts is that performance will not be decreed where the contract is not certain in its terms. The terms must be complete and free from doubt or ambiguity, and must make the precise act which is to be done clearly ascertainable.' "

While in the instant case it is true that the earnest money receipt contains some of the terms of a proposed lease, the receipt clearly contemplates that the term of the lease shall not begin to run, nor shall appellant have possession of the premises, until a *proper* lease has been executed. It is plain to us that what the terms of this proper lease were to be was something which was to be later agreed upon by the parties. The parties have been unable to agree, and we are of the opinion the term *proper lease* is so indefinite that this court cannot compel specific performance of the contract, because it cannot tell, and should not attempt to say, what the parties meant by a *proper lease.*

An agreement to enter into a lease should not be enforced if any of the terms of the lease are left open to future settlement. Until the minds of the parties have met on all material matters, a court should not direct specific performance. *Dan Cohen Realty Co. v. National Sav. & Trust Co.,* 125 F. (2d) 288, 289. See, also, Bennett, Laws of Landlord and Tenant, pp. 514-515, § 362; *Woods v. Matthews,* 224 Mass. 577, 113 N. E. 201.

We do not desire to be understood as holding that a contract to make a lease might not be subject to specific performance even though the contract did not itself contain all the conditions and provisions of such lease, because cases will be found where such contracts have been enforced; for instance, where the contract, although not certain as to all the terms of the instrument, provides a certain and binding way of making it certain. *Faucett v. Northern Clay Co.,* 84 Wash. 382, 146 Pac. 857. Neither do we desire to be understood as holding that a contract for a lease, mortgage, or other instrument affecting real estate might not be subject to specific performance even though the contract does not contain all the provisions of the instrument to be drawn, but does contain the essential elements, and where it does not appear that the provisions of such lease, etc., were to be subsequently determined by the parties. See *Klitten v. Stewart,* 125 Wash. 186, 215 Pac. 513, and *Chapman v. Milliken,* 136 Wash. 74, 239 Pac. 4. The cases last cited and others

of like tenor are not authority which will support specific performance of the contract in the instant case.

In conclusion we are of the opinion that the earnest money receipt in the case at bar is too indefinite and uncertain to permit of its being specifically enforced.

In view of the conclusion reached by us, it becomes unnecessary to pass upon the other assignments of error, as it follows that appellant would not be entitled to an accounting, nor would he be entitled to have judgment entered without prejudice.

The judgment of the trial court is affirmed.

BEALS, STEINERT, and GRADY, JJ., concur.

SIMPSON, C. J. (dissenting)—The written contract concerned in this litigation, as I view it, is simple, definite, and specific in its terms and therefore subject to specific performance. There is no ambiguity in the wording of the earnest money receipt that calls for interpretation by parol evidence. The real property was properly described. Respondent agreed to

" . . . execute a lease to Clarence Keys for five years for the above described real property and improvements thereon, consisting of the hotel building, for $375.00 per month, payable monthly in advance, reserving, however, to herself the rental upon the office space located on the east side of said building on the ground floor, she to agree, however, not to rent said space to any person who might be in competition with the purchaser and lessee in the operation of a club or in the hotel or restaurant business.

"The undersigned further agrees that she will vacate her apartment by July 1, 1943, and will allow a credit of $15.00 a month rental until she vacates the same. All fixtures and equipment in said apartment may be removed by her with the exception of hotel equipment now stored in said apartment.

"Immediately upon completion of proper bill of sale, chattel mortgage and lease, the undersigned agrees that she will execute the same and surrender possession, and that the earnest money this day paid will be applied upon the total consideration to be expressed therein."

"Specific performance may be defined as the actual accomplishment of a contract by the party bound to fulfill it,

for a decree for specific performance is nothing more or less than a means of compelling a party to do precisely what he ought to have done without being coerced by a court. It is an equitable remedy of very ancient origin. It has been declared to be the most useful of the various equitable remedies, and is available under certain circumstances hereinafter discussed to protect rights under contract.

"The remedy of specific performance of contracts is purely equitable; courts of law have no power to compel specific performance of any kind of contract. The remedy at common law available to a party injured by breach of a contract is an action for damages. In many instances, however, damages at law afford inadequate compensation for breach of a contract, and where the remedy at law is inadequate—where, because of features or incidents of the contract inhering in its subject matter, its terms, or the relation of the parties, an action at law is not maintainable, or the injury cannot be adequately compensated by the recovery of damages—equity takes jurisdiction to require the specific performance of the contract in order to do more complete justice between the parties than can be had in an action at law. Equity proceeds upon the assumption that the normal end or termination of every contract is performance in accordance with the agreement. When parties enter into an agreement, each expects to receive and render performance according to its express terms, and the contract can never be fully satisfied unless its execution is of that character. Neither party has any legal right to refuse to perform the obligations imposed, in the absence of a reservation of the right to terminate the contract upon some contingency, unless because of circumstances subsequently arising there exists some valid legal excuse for nonperformance. Thus, while the right to refuse performance depends upon some justification recognized in the law, the power to violate the contract by refusal to perform, subject to liability in an action for damages, exists when the circumstances are such that the courts will not decree the specific performance of the contract.

"Equity assumes justification where the remedy at law is not adequate to decree specific performance, in order to prevent the travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay inadequate damages for the breach. It acts, however, only on the principle that it would be unjust and inequitable to permit the contract to remain unen-

forced, or, as has been stated, where nothing can answer the justice of the case but the performance of the contract in specie." 49 Am. Jur., p. 6, Specific Performance, § 2.

The following Washington cases uphold the right to specific performance: *Thill v. Johnston,* 60 Wash. 393, 111 Pac. 225; *Klitten v. Stewart,* 125 Wash. 186, 215 Pac. 513; *Perkins v. Allen,* 133 Wash. 455, 233 Pac. 655; *Chapman v. Milliken,* 136 Wash. 74, 239 Pac. 4.

The contract mentioned in *Thill v. Johnston, supra,* provided, in part, as follows:

" 'Now, Therefore, it is mutually agreed between the party of the first part and parties of the second part that the party of the first part is to have the said land above described, and parties of the second part are to have all the merchantable timber on the said land. Parties of the second part are to have six years within which to remove said timber from said premises. Party of the first part agrees for a period of six years not to clear land in and among said merchantable fir and cedar timber. After six years from date party of the first part is to have the right to clear land within the area covered by said merchantable fir and cedar timber. All timber on said premises at the end of 8 years from date is to revert to and become the property of party of first part. Party of the first part is to pay two hundred and fifty dollars ($250) of the remaining portion of the purchase price of said premises on the said contract with said James Swan and Stella M. Swan and parties of the second part are to pay two hundred and fifty dollars ($250) of said purchase price on said contract. If said parties of the second part remove said timber at any time before November 2d, 1907, at such time they are to pay said two hundred and fifty dollars ($250) required to be paid by them upon said contract with said James Swan and Stella M. Swan. At time deed of said premises is received from said Swans, parties of the second part will deed their interest in land to party of first part, reserving timber therefrom, but if timber is removed before deed from Swans then parties of second part will deed same premises to party of first part at such time."

In passing upon the issue presented, this court said:

"It is contended in behalf of appellants that the contract is too uncertain in its terms to entitle respondent to a decree of specific performance, in that the time for the re-

moval of the timber is uncertain. Passing the question of such uncertainty rendering the contract unenforcible, we think that, in view of all the provisions of the contract relating to the removal of the timber, it can readily be seen that the parties intended the appellants to have eight years for that purpose without forfeiture of their rights to the timber. The six-year clause standing alone would seem to indicate otherwise, but following that clause are the words: 'After six years from date party of the first part is to have the right to clear land within the area covered by said merchantable fir and cedar timber.' These words clearly indicate that the appellants were still to have some right on the land after the expiration of the six years named, and by the language following this clause of the contract it is evident that such right consisted of the right to the timber for two years longer subject to this clearing right. This necessarily gave them the right to go upon the land and remove the timber during that time. We are of the opinion that the contract is sufficiently certain to warrant a decree of specific performance."

The exchange and commission contract construed in *Chapman v. Milliken, supra,* provided that a certain property should be conveyed subject to a mortgage. In passing, we said:

"It is also contended that the contract is too indefinite and uncertain to be reformed, or to be specifically performed, because it does not provide for the length of the term of the mortgage referred to, nor the rate of interest to be paid under the mortgage assumed.

"This objection is not valid. The offer of appellants in the contract did not specify that respondents were to convey subject to a mortgage of record, or which actually existed and was to be paid in a certain length of time, or at any specific rate of interest; but agreed, as a matter of fact, to convey subject to a mortgage of $3,500, which was done; and any rate of interest within the legal rate of six per cent would be deemed agreed to under our statute, none being otherwise specified."

I find the following in the *Klitten* case just cited:

"In November, 1920, the respondents, Klitten, sold to the appellant, Stewart, the furniture and equipment of a hotel in the city of Kennewick, and also leased to her the hotel building for a term of five years. The consideration for the

furniture and equipment was $15,000. Of this sum Mrs. Stewart paid a part in cash and in negotiable securities which were converted into cash, gave a mortgage on the furniture for the sum of $2,100 for another part, and for the balance, $8,000, assigned to the respondents certain notes secured by a mortgage on real property situated in the state of South Dakota. The notes mentioned were, at the time the negotiations began, in the possession of a bank in South Dakota, and were forwarded by the bank to a bank at Kennewick. When examined, the mortgage given to secure them was found to be a second mortgage on the property, and a lien was claimed upon the instrument by the Dakota bank for the sum of $800. A banker in South Dakota, to whom an inquiry had been sent, made a favorable report on the securities, but the respondents were not satisfied therewith. The appellant thereupon agreed, in case the notes were not paid at their maturity, to give a chattel mortgage on the hotel equipment as further security. This agreement was evidenced by a writing in the following form:

" 'November 30, 1920.

" 'In case the note of $2,000 which is due Mch. 1, 1922, and the $3,000 note due Mch. 1, 1923, and the $3,800 note due Mch. 1, 1924, are not paid, I agree to give a mortgage on furniture for above notes.     Mrs. E. M. Stewart.'

"Thereafter the deal was closed and the appellant was put into possession of the property.

"When the first of the notes secured by the Dakota property matured, it was not paid, nor was the interest then due on the remaining notes paid, and inquiry developed that the notes were practically valueless. The respondents then demanded of the appellant a mortgage on the hotel equipment to secure them. The appellant refused to execute the mortgage, whereupon the respondents began the present action to enforce a specific performance of the agreement. The trial resulted in a decree of the court directing the appellant to execute within ten days a chattel mortgage on the hotel property, securing the notes according to their tenor and effect, appointing the clerk of the court a commissioner to execute the mortgage in the case the appellant failed so to do. . . .

"It is next contended that the agreement is not one of which a court of equity will decree a specific performance, in that it is not sufficiently direct and certain in its terms. But we think the contract sufficiently definite in this respect. It is not, it must be admitted, entirely free from ambiguity.

But construing it in the light of the surrounding circumstances, it is plainly a contract to give the additional security should it become evident that the notes would not be paid by the persons bound thereon. The evidence was ample to justify the conclusion that they would not be so paid. Foreclosure of the first mortgage had been instituted, and inquiry on the ground by one of the respondents developed that the sale of the property would bring no more than the amount of the mortgage, and that the makers of the notes and the indorser thereof were without other unincumbered property."

The majority seem to stress the words "proper lease," and conclude that those words indicated that something was to be added or included in the lease at the time it was prepared. To my mind, a "proper lease" could be only one which embodied those things mentioned in the earnest money receipt. There should be enforced in this case the execution of the lease of the described property for a period of five years from May 6, 1943, at a rental value of $375 per month, payable monthly in advance, with a reservation of the office space located on the east side of the building on the ground floor, with the further agreement not to rent the reserved space to any person who might be a competitor of the lessee. Such a lease would be a proper one, and would carry out the definite intention of the parties as disclosed by the written instrument signed by respondent.