[No. 29808. Department Two. April 8, 1946.]

KVI, Inc., *Appellant,* v. Laura M. Doernbecher *et al.,*
*Respondents.*[1]

*Metzger, Blair & Gardner* and *Thomas L. O'Leary,* for
appellant.

*Eisenhower, Hunter & Ramsdell,* for respondents.

Beals, J.—Puget Sound Broadcasting Company, Inc., a
Washington corporation, for some years has owned and
operated radio station KVI in the city of Tacoma. It owns
a tract of land on Vashon island upon which is located its
transmitter—its broadcasting studio occupying rented space
in Tacoma. It also owns a license, granted by the Federal
communications commission, authorizing it to operate a

[1] Reported in 167 P. (2d) 1002.

radio station on a radio frequency of 570 kilocycles and to use the call letters KVI.

The capital stock of the corporation consists of 1,250 shares of a par value of one hundred dollars each. During the month of July, 1943, Laura M. Doernbecher owned 1,041 of the shares, her daughters owned 110½ shares (one daughter, Vernice Irwin, being a party defendant herein), and 98½ shares were divided among other stockholders. A few months later, Mrs. Doernbecher acquired the group of 98½ shares.

Early in 1943, Messrs. Sheldon F. Sackett and Ben E. Stone, who were operating two radio stations, one in Oregon and one in Vancouver, Washington, became interested in acquiring station KVI. Mr. Reuben Carlson, who was Mrs. Doernbecher's attorney, was authorized by her to conduct negotiations in connection with the proposed sale of the station, and Messrs. Sackett and Stone accordingly discussed the matter with Mr. Carlson. A written memorandum was prepared, containing the following paragraph, which was signed by Messrs. Sackett and Stone, July 27, 1943:

"The undersigned, Sheldon F. Sackett and Ben E. Stone, agree to organize the corporation mentioned above to be called KVI, Inc. and in the interim for a good and valuable consideration would be personally responsible for all covenants above contained and to be performed by the purchaser, and to cause said corporation when formed to faithfully perform each and all the agreements above named and also enter into the formal agreement when the same is prepared."

The following day, Mrs. Doernbecher approved the memorandum by signing a paragraph reading as follows:

"The undersigned, Laura M. Doernbecher, the owner of a majority of the outstanding shares of the seller, Puget Sound Broadcasting Company, Inc., does hereby agree to the terms and conditions set forth in the above memorandum and further agrees that she will at any meeting of the shareholders and directors of said corporation vote to authorize the sale of the assets covered in said memorandum agreement upon the general terms and conditions as out-

lined herein to the full extent of her ability, and she does further acknowledge as an individual seller that said agreement contends and is of sufficient consideration to support her individual endorsement hereof."

This document is entitled "MEMORANDUM," and we quote the first two paragraphs thereof:

"This memorandum is prepared by way of a preliminary agreement concerning the essential terms to be embodied in a formal agreement between the parties hereto upon the approval hereof by both parties. The main conditions and terms are embodied herewith, although both parties shall have the right hereafter to insert in the formal agreement minor conditions which are not stated today.

"The seller shall be Puget Sound Broadcasting Company, Inc., a Washington corporation, the owner of Radio Station KVI. The ultimate purchaser in the formal agreement shall be KVI, Inc., a new Washington corporation, to be formed pursuant to the terms of this agreement."

By its terms, the memorandum contemplated the sale by Puget Sound Broadcasting Company, Inc. (hereinafter referred to as the broadcasting company), of the license issued to it by the Federal communications commission, referred to above, and its fixed assets, to a corporation to be formed and called KVI, Inc.

The purchase price of one hundred twenty-five thousand dollars was to be paid—forty thousand dollars upon the granting of a formal order by the Federal communications commission (hereinafter referred to as the Federal commission), approving the transfer of the station, the balance to be paid in installments over a period of seventy-two months from the date that the order approving the transfer would become effective, deferred payments to be secured by mortgage upon the assets sold.

In the memorandum, it was provided that the broadcasting company should be the seller, but that corporation did not sign the memorandum, and Mrs. Irwin was not named as a party thereto, nor did she sign it.

The memorandum also contained a description of the property to be sold:

"The purchaser under this proposed memorandum and

the formal agreement shall purchase assets only from the corporation and not the stock of the corporation of the seller. Said assets which are to be purchased shall consist of the following:

"1. [A license issued by the Federal Communications Commission.]

"2. The transmitter tower and all equipment used in connection therewith together with the real property upon which said transmitter tower and equipment is located on Vashon Island, King County, Washington, including specifically all of the land commonly used for said tower, transmitter and equipment and the summer cottages and summer home located thereon, it being the intent to transfer to the purchaser all of the real and personal property owned by the seller and located on Vashon Island, except certain personal items, an itemized list of all property to be conveyed hereunder and located on said premises of Vashon Island to be attached to and made a part of the formal agreement following this memorandum.

"3. Furniture, speech equipment, studio equipment, records, transcriptions and all other personal property of every kind and nature owned by the seller and used or useful in connection with said studio located in the Rust Building; that said equipment as to the major items shall be itemized and made a part of the formal agreement to be made hereafter."

For several months after the signing of the memorandum, the parties thereto discussed certain modifications, Messrs. Sackett and Stone being represented by Mr. J. W. McInturff, an attorney practicing in Marshfield, Oregon, and Mr. Carlson representing Mrs. Doernbecher. It being considered that the sale of the corporate assets might present some difficult questions concerning Federal taxes, it was agreed that the capital stock of the broadcasting company should be sold, rather than the corporation's assets, the buyers agreeing to pay the entire purchase price in cash.

The memorandum contained the following, concerning the time the transfer was to be consummated:

"When the effective date and approval of the sale provided for herein is made by the Federal Communications Commission and an effective date of transfer is determined and order by said Commission is received, the seller will convey the foregoing property to the buyer and will pay

all expenses of every kind and nature incurred by the seller up to the effective transfer date, and the buyer will assume and pay all accounts incurred by it subsequent to said date of transfer. . . .

"The effective date where that term is used herein shall mean the time that the Commission will actually authorize this transfer."

The memorandum concluded with the following paragraph:

"The seller will within a reasonable time cause a meeting of its shareholders and directors to be held authorizing the sale of the foregoing assets, and upon the execution of the formal agreement and pending the approval of the Federal Communications Commission, the buyer will deposit in escrow with the formal agreement the sum of Forty Thousand ($40,000) Dollars or an irrevocable banking commitment in form and in a bank acceptable to the seller guarantying the payment of said amount upon receipt of such approval."

After protracted negotiations, which we shall hereinafter discuss, the parties failed to reach an agreement upon certain terms and conditions of the sale, and KVI, Inc., a corporation, the plaintiff herein, instituted this action against Mrs. Doernbecher, Vernice Irwin, and Puget Sound Broadcasting Company, Inc., a corporation, alleging in its complaint the execution of the memorandum referred to above, a copy of which was attached to the complaint as exhibit A.

The complaint further alleged that the memorandum was subsequently modified by the agreement of the parties that Messrs. Sackett and Stone, the predecessors in interest of the plaintiff, should purchase the capital stock of defendant broadcasting company, instead of its assets; that the plaintiff corporation had ratified and adopted the memorandum agreement made on its behalf by Messrs. Sackett and Stone, who had deposited the sum of forty thousand dollars, being the amount of the initial payment to be made, according to the terms of the memorandum, with the person therein named to receive that deposit.

Plaintiff further alleged that the stock controlled by the

defendant broadcasting company could not be transferred to the plaintiff, or to any other person, without the written approval of the Federal communications commission of the United States; that it was necessary that defendant broadcasting company join in any application to the commission for permission to transfer the controlling interest in its stock; and that, for this reason, the broadcasting company was made party defendant to the action.

The complaint further alleged that on or about February 9, 1944, the defendants Doernbecher and Irwin, through their attorney, advised Messrs. Sackett and Stone that they refused to carry out or perform the terms of the memorandum, and returned the forty-thousand-dollar check and other documents which had been left with them; and that, thereafter, Messrs. Sackett and Stone, in good faith, negotiated in an attempt to obtain performance of the memorandum, or, as it is referred to in the complaint, the "contract" or "agreement," but that the negotiations were unsuccessful.

It was further alleged that the plaintiff and Messrs. Sackett and Stone had done and performed everything required of them to be done and performed, and at all times had been and were ready, able, and willing to pay the purchase price, which they offered and tendered to defendants. The concluding paragraph of the complaint read as follows:

"That plaintiff is willing to accept in full performance of said agreement the greatest number of shares of the capital stock of the defendant, Puget Sound Broadcasting Company, Inc. owned by the defendants, Laura M. Doernbecher and Vernice Irwin, and each of them, at any time between the 30th day of July, 1943 and the date of transfer thereof with the consent and approval of the Federal Communications Commission."

Plaintiff then prayed for judgment that the defendants be required to join with plaintiff in applying to the Federal commission for written approval of the sale to plaintiff by the defendants of the controlling interest in the defendant corporation, and that, upon such approval being granted by order of the commission, the defendants Doernbecher

and Irwin "be required to specifically perform and carry out their agreement as herein set forth." Plaintiff further asked for judgment for twenty thousand dollars against each of the defendants by way of damages, and asked that, if specific performance be not granted, plaintiff have judgment against the defendants and each of them in the sum of fifty thousand dollars.

Vernice Irwin answered, denying all material allegations of the complaint and alleging that she had at no time agreed with Messrs. Sackett and Stone, or with the plaintiff, that she would sell her stock in the broadcasting company.

The defendant broadcasting company answered, denying the allegations of the complaint and affirmatively alleging its ownership of station KVI, and that plaintiff corporation had been organized for the purpose of attempting to acquire the good will of the defendant corporation in its radio station, operating under the name KVI. The broadcasting company asked that the action be dismissed, and that plaintiff be enjoined from using the name KVI.

Mrs. Doernbecher answered the complaint, admitting that the stock control of defendant broadcasting company could not be transferred without written approval of the Federal commission, and denying the other allegations of the complaint. By way of an affirmative defense, Mrs. Doernbecher admitted that Messrs. Sackett and Stone had negotiated with her attorney for the purchase of the assets of the broadcasting company; that she had signed the memorandum, referred to above and made a part of plaintiff's complaint as exhibit A, "with the understanding and agreement that the same should not be effective for any purpose whatsoever" if the sale of the assets of the broadcasting company would result in any income tax liability to that corporation or to the answering defendant, and that the memorandum was delivered to Messrs. Sackett and Stone under the express condition that if, upon further examination, it should appear that any income tax liability might result from carrying out the contemplated transaction, the memorandum would be ineffective for any purpose and was to be canceled. The affirmative defense contained other allegations to the effect

that the parties to the negotiations had at no time arrived "at a meeting of the minds" on any contract.

Plaintiff replied to the affirmative defenses with denials, and the action, being equitable in its nature, was tried to the court, with the result that judgment was entered dismissing the action, from which plaintiff has appealed.

Considerable testimony was introduced, the statement of facts containing one hundred seventy-eight pages, and fifty-three written exhibits were introduced by appellant.

The negotiations between the parties, looking toward a consummation of the sale, commenced immediately after the signing of the memorandum referred to above. (Italics are ours.)

July 28, 1943, Mr. Carlson telegraphed Mr. Sackett as follows:

"MEMORANDUM AGREEMENT APPROVED BY INTERESTED PARTY WILL PROCEED TO CALL REQUIRED MEETING AS SOON AS POSSIBLE AND WILL PREPARE FORMAL CONTRACT PLEASE CONFIRM."

July 29th, in answer to this wire, Mr. Sackett telegraphed Mr. Carlson:

"YOUR JULY 28 NIGHT LETTER RECEIVED WITH APPRECIATION FOR YOUR SERVICES. WE WOULD LIKE ONE COPY OF AGREEMENT SIGNED BY BOTH PARTIES IN OUR POSSESSION AT YOUR EARLY CONVENIENCE. SUGGEST YOU PREPARE CONTRACT AFTER RECEIPT OF OUR LETTER. BEST REGARDS."

The same day, Mr. McInturff wrote Mr. Carlson, enclosing a copy of Mr. Sackett's telegram and discussing the matter at considerable length, the principal subject of the letter being the probability that sale of the broadcasting company's assets would result in payment of an income tax, while sale of the capital stock of the company would probably have a contrary result. We quote pertinent portions of the letter:

"Enclosed please find copy of wire of confirmation by Sheldon F. Sackett.

"We have been seriously thinking over the possible income tax angles involved in this transaction, both from our standpoint and the standpoint of your clients.

"Our income tax adviser agrees that if your client should sell the capital stock of the corporation for the agreed

purchase price that there would be no income tax against your client. On the other hand, if the corporation sells its assets for the agreed purchase price there probably would be an income tax to the corporation inasmuch as the corporation has from year to year made a deduction for depreciation, and your depreciated book value of your physical assets does not equal the agreed purchase price. On this matter we suggest that you submit the problem to your own income tax adviser.

"We suggest that at your corporation meeting you have the stockholders and directors approve the alternate procedure, first, adopt a resolution to sell the physical assets for the agreed purchase price and so forth, *as was in mind at the time we conferred with you*; second, have the stockholders and directors adopt a resolution dissolving the corporation and distributing the assets of the corporation to the stockholders ratably, according to their stock holdings.

"Later on when this tax matter has been fully determined, such minutes can be drawn as will be to the interests *of both parties.*

"Now that *the principal factors* of the agreement between us have been arrived at may we frankly state: first, that in our opinion the physical assets which we are purchasing are worth considerably more than the depreciated value as shown on your books, and that we would not like to be bound to set them up at your depreciated value on the balance sheet of KVI, INC.

"By making our transaction a purchase by KVI, INC. of the assets of the Corporation after their distribution ratably to the shareholders any possibility of a corporation income tax on the sale to the Puget Sound Broadcasting Company we think would be foreclosed inasmuch as distribution of the assets under these circumstances would not be a taxable gain. . . .

"There is, we believe, *a further mutual advantage* in this method of procedure. There is always the latent possibility that the Federal Communications Commission will not look with favor, and might object to a transaction wherein the purchase price represents a great excess over the depreciated book value of a corporation's assets on the theory that no individual or corporation has a right to capitalize highly a government granted franchise extending only for a two-year period. *When our transaction is ready for presentation to the Federal Communications Commission,* it would be our suggestion . . .

"We would like it understood that in making this suggestion we have in mind that all these corporate transactions would be largely simultaneous, or largely in sequence, and the entire procedure would be submitted to the Federal Communications Commission for approval."

July 30th, and prior to the receipt of Mr. McInturff's letter, Mr. Carlson wrote Mr. Sackett:

"Pursuant to your wire of July 29th I enclose herewith a copy of the memorandum agreement signed by both parties as shown thereon. Mrs. Doernbecher was agreeable to the transaction as outlined and suggested that she would be open to a suggestion on your part to have a representative of your organization manage KVI pending confirmation of the sale *following the formal execution of the contract.*"

August 4th, Mr. Sackett wrote Mr. Carlson:

"This acknowledges with thanks your letter of July 30th and its enclosure. Both Mr. Stone and I are interested in the suggestion of Mrs. Doernbecher regarding interim management of KVI.

"However, we both feel that this is a matter which can best be initiated orally and after some discussion by all the parties, which would bring out their respective interests and positions. I therefore suggest that you confer with her and perhaps arrange a tentative date when we could meet, say in Tacoma and go over that situation. *There will doubtless be discussions in working out the details of KVI's sale which will be clarified by oral discussion* and the conference about management with Mrs. Doernbecher might also be helpful in expediting the application to FCC for the actual transfer."

August 19th, Mr. Carlson wrote Mr. Sackett a letter containing the following paragraph:

"Since your last visit to Tacoma, we have had another offer for the purchase of the station from a party in Seattle who is rather substantial. I told Mrs. Irwin that I did not think it would be proper to discuss any further offers *inasmuch as I considered our negotiations have terminated in a formal understanding subject only to working out the same satisfactory to both purchaser and seller. I take it that this is also your complete understanding.*"

After some further communications by wire and letter, it was agreed that the parties should meet, August 26th,

at Mr. Carlson's office. Concerning this proposed conference, Mr. Sackett telegraphed Mr. Carlson, August 23rd:

"UNLESS YOU WIRE ME MONDAY, MARSHFIELD, TO CONTRARY, WILL PROCEED WITH PLANS TO BE AT YOUR OFFICE AT TACOMA BY 10:30 AM THURSDAY AUGUST 26, WITH MCINTURFF TO MEET YOU, MRS DOERNBECHER AND MRS IRWIN *TO DISCUSS FURTHER DETAILS COMPLETION OUR TRANSACTION AND KINDRED MATTERS. . . .*"

August 27th, Mr. Sackett, Mr. McInturff, and a secretary, Mr. Carlson, Mrs. Doernbecher, and Mrs. Irwin, met at Mr. Carlson's office. Various matters were discussed, including the question of Federal taxes, and the meeting terminated without reaching any final conclusion upon that question.

September 29th, Mr. Sackett telegraphed Mr. Carlson:

"MCINTURFF NOW PREPARING DRAFTS OF NEW CORPORATE ARTICLES AND BY LAWS, CONTRACT BETWEEN VENDOR AND VENDEE *TO SUPPLANT EXISTING CONTRACT,* MORTGAGE AND TRUST INDENTURE FOR EARLY SUBMISSION TO YOU FOR CHANGE AND/OR APPROVAL. . . ."

October 4th, Mr. McInturff wrote Mr. Carlson, his letter containing the following:

"I am now making a draft of the *proposed* contract of purchase. We will be able to submit it to you within the next few days."

Mr. Carlson answered this letter, October 6th, advising Mr. McInturff that Mrs. Doernbecher was perturbed over the fact that Mr. Sackett had disclosed to several people the terms of the contemplated transaction and that, for this reason, Mr. Carlson felt that the matter could proceed only "on the basis of the sale of the complete stock in order to be sure that there will be no tax involved." Mr. Carlson also stated that he was certain that Mrs. Doernbecher would not consent to the filing of any articles (of incorporation)

". . . until this deal has been consummated and the full amount of cash required to be paid under our present memo has been deposited in a local bank. I would, therefore, suggest that you complete a copy of the contract and be prepared to deposit the funds as required before I request permission from Mrs. Doernbecher to consent to the filing of the papers involved. . . ."

October 7th, and before receiving Mr. Carlson's letter of October 6th, Mr. McInturff wrote Mr. Carlson, the letter reading in part as follows:

"Enclosed please find copy of proposed contract in reference to purchase of capital stock of Puget Sound Broadcasting Company, Inc. for your criticism and revision, if necessary. . . . .

"It is entirely satisfactory to us to have all papers filed concurrently with the filing of the Articles of Incorporation of KVI, Inc., and to at the same time pay unto the escrow party the down payment of $40,000.00."

The proposed agreement, prepared by Mr. McInturff, covers four single-spaced typewritten pages, naming Laura M. Doernbecher first party and KVI, Inc., second party. Paragraph 11 and subsection (c) of paragraph 12 of the proposed agreement read:

"(11) In the event that the Federal Communications Commission should fail to approve the purchase and sale as herein contemplated, within 24 months from the date hereof, or within such further time as the parties hereto shall agree upon, then this agreement shall terminate and all papers, documents and monies held by the escrow party shall be promptly returned by the escrow party to the party placing the same in escrow, whereupon this agreement shall have no further force or effect.

"(12) (c) In the event the purchase and sale as contemplated in this agreement is not approved by the Federal Communications Commission within 24 months, or within such other time as the parties hereto shall agree, then to deliver back to the First Party all capital stock of Puget Sound Broadcasting Company, Inc. placed in escrow by the First Party, and to deliver back to the Second Party such monies, documents or instruments as the Second Party may have placed in escrow with the escrow party."

It seems to be agreed by both appellant and respondents that these suggestions were not in accord with the original memorandum and that there were some other points of departure between the two documents.

October 13th, Mr. Carlson wrote Mr. McInturff, from which letter we quote:

"After our discussions, we have reached the following

procedure, which we would like to follow subject to your approval.

"Agree to convey subject to the terms of our original memo all of the capital stock owned by the seller for the price agreed upon plus the cash on hand and receivables to be paid for at the time of the effective date of transfer. That is to say, you would make the down payment at the time of the execution of the contract and on the effective date of the transfer you would further pay to the seller an amount equivalent to cash on hand in the corporation and turned over to you and would further agree to take care of the accounts receivable as outlined in your proposed contract."

Mr. Carlson stated his client's position on several other points and suggested changes in the proposed agreement.

October 16th, Mr. McInturff replied to Mr. Carlson's letter, stating, *inter alia*:

"Of course, it goes without saying that the various proposals we have made for completing this transaction are proposals only, and that unless other means can be found satisfactory to both parties, then both parties would be required to stand upon their original commitment, which we are now, and have at all times been ready, willing and able to do."

Mr. McInturff then discussed other matters, his letter concluding:

"We feel that the differences between us are not so great but that they could be satisfactorily adjusted at a conference between us, and we are wondering if it would be possible for you to meet us in Portland at an early date for that purpose. However, it may be possible for us to satisfactorily adjust the entire matter by . . . correspondence."

November 5th, Mr. Sackett and Mr. McInturff met Mr. Carlson at his office, a Mr. Knight also being present to advise concerning matters of taxation. An understanding was reached to the effect that, instead of purchasing the assets of the broadcasting company, with the exception of cash on hand and accounts receivable, as provided in the memorandum, appellant herein would purchase the capital stock of the broadcasting company from Mrs. Doernbecher,

at the price of one hundred twenty-five thousand dollars, plus the amount of cash on hand and accounts receivable.

November 5th, Mr. Sackett delivered to Mr. Carlson a check for forty thousand dollars, payable to Mrs. Doernbecher, all as provided in the memorandum. Mr. Carlson gave Mr. McInturff a receipt for this check as follows:

"Received of J. W. McInturff as Trustee of the Sackett Trust, check No. 1 for $40,000.00, payable to Laura M. Doernbecher, said check being dated November 5, 1943 and drawn upon the Coos Bay National Bank of Marshfield, Oregon, signed Sackett Trust by J. W. McInturff, Trustee.

"Which check is to be delivered to Laura M. Doernbecher when satisfactory papers and documents are executed in reference to the purchase by Sheldon F. Sackett or a corporation formed by him of the stock or physical assets of Puget Sound Broadcasting Company and further upon the approval of the Federal Communications Commission of the transfer of the license to operate Radio Station KVI of Tacoma, Washington.

"Should the Federal Communications Commission, after proper application therefor has been made, refuse to permit such a transfer then said check to be returned to J. W. McInturff, Trustee or his successor in trust."

So far, it does not appear that there had been any particular discussion between the parties as to an agreement upon any time limit within which the approval of the Federal commission should be given. Mr. Carlson, however, had requested that the full purchase price of one hundred twenty-five thousand dollars be paid in cash and suggested that this might be arranged by the purchasers' procuring a loan from the National Bank of Washington at Tacoma, to be secured by mortgages. Apparently, this was agreed to by Mr. Sackett and his attorney.

At this point, it appears that the matters which had been the subject of discussion between the parties had been substantially agreed upon, with the understanding that they would later be embodied in a formal contract. While appellant contends that the execution of such a formal contract was not necessary to make a binding agreement between the parties, it is stated in appellant's brief that:

"The parties intended that their agreement should be reduced to a formal contract, which formal contract was never executed."

November 21st, Mr. McInturff wrote Mr. Carlson, his letter containing the following paragraph: "Our draft of the agreement between Mrs. Doernbecher and KVI, Inc. will come forward in the next few days."

November 22nd, Mr. Carlson wrote Mr. Sackett, informing him that a news item had been published stating that the radio station had been sold, and that a number of the employees of the station had concerned themselves in the matter, and, *inter alia,* that:

"In connection with our application it will be necessary to make a complete disclosure of the sale and Mrs. Irwin would like a statement from you concerning the future status of employees other than executives. . . ."

November 30th, Mr. Sackett answered Mr. Carlson's letter, making the following statement pertinent to this inquiry:

"Your comments regarding the employees of KVI I have noticed with care. First, the longer a deal is in the making the more chances there are for slips; the Bulletin note is typical thereof. I think it behooves us all to bend all energies to *complete the formal filing and make the sale a matter of record.*

"On our part, McInturff advises me the mortgage is now complete and says the substitute agreement with Mrs. Doernbecher will be sent you this week. . . ."

December 6th, Mr. Carlson wrote Mr. Sackett, saying in part: "I will appreciate receiving from Mr. McInturff the *substituted agreement which we reached at our last conference.*"

December 7th, Mr. McInturff wrote Mr. Carlson a letter containing the following:

"Enclosed please find original and five copies of *proposed agreement* between Laura M. Doernbecher and KVI, Inc. We have given considerable thought and study to this particular agreement and trust that it will meet with your approval. . . . We trust that you will find the agreement satisfactory in all respects, and that you will forthwith have Mrs. Doernbecher sign all five copies."

Mr. McInturff also called Mr. Carlson's attention to a provision in the agreement to the effect that, if the bank refused to advance the money, Mrs. Doernbecher would make the loan.

The proposed agreement, prepared by Mr. McInturff and forwarded with his letter referred to above, contained a provision in paragraph 10 that each party should forthwith make application to the Federal commission for its approval of the purchase and sale, each party agreeing to deliver to the commission all necessary documents, etc. Paragraph 18 named the National Bank of Washington at Tacoma as escrow holder. Paragraph 18 (a) provided what should be done by the escrow holder in the event that the Federal commission approved the sale. Paragraph 18 (b) read in part as follows:

"(b) In the event the Federal Communications Commission shall refuse to approve the sale, *or should fail to approve the same within 24 months from the date hereof,* then said escrow party shall: . . ."

The paragraph continued by providing for redelivery to the respective parties of documents and money which were to be placed in escrow with the bank.

After some negotiations by telegraph, telephone, and letter, Mr. Carlson wrote Mr. Sackett, January 3, 1944, stating that Mrs. Doernbecher had objected to certain provisions contained in the "revised form of contract," which Mr. McInturff had prepared. Mr. Carlson stated, separately, five objections, followed by:

"6. In Paragraph No. 18, Mr. McInturff provided that you should have 24 months from the date of the agreement to allow for approval thereof by the Federal Communications Commission. All of us feel that this is entirely too long and that 6 months should be ample. The transaction involved is simple and the Commission can certainly make a definite ruling within a period of 6 months from the date the agreement is actually signed. You can well appreciate that conditions are rather upset by reason of the proposed agreement, and will continue to be upset until we receive the approval from the Commission. I certainly could not advise my clients that this matter should be held open for a period of 24 months."

January 6th, Mr. Sackett acknowledged receipt of Mr. Carlson's letter, agreeing to some of the suggestions which Mr. Carlson had made and refusing to comply with others. Mr. Sackett commented on Mr. Carlson's objection 6, *supra,* and continued:

"Two years is a customary deadline in radio sales, I believe. Recently in advising an estate which is selling a radio that is the provision which went into the contract. As a concession I would be willing to reduce the time to 18 months but anything less than that would not be satisfactory to me.

"I shall appreciate your early submission of this matter to your client. It does not seem there are any matters which now cannot be quickly concluded."

After a conference in Tacoma, January 14th, Mr. Sackett wired Mr. Carlson, January 20th, in regard to certain revisions in the proposed agreement concerning the mortgage, and further stated:

"1. AT LEAST ONE YEAR MAXIMUM FROM TIME APPLICATION FOR TRANSFER ACCEPTABLE IN FORM IS RECEIVED BY FEDERAL COMMUNICATIONS COMMISSION."

Two other suggestions were made, to which Mr. Carlson agreed by letter dated January 25th. Referring to the portion of Mr. Sackett's wire quoted above, Mr. Carlson wrote:

"We have given very careful and deliberate consideration to the first condition set forth in your wire, to the effect that the contract would be binding until the approval or disapproval of the commission, with the provision that a twelve (12) month time period be inserted for this approval or rejection."

Continuing, Mr. Carlson stated that he had received a "public notice" from the Federal commission, containing a provision to the effect that an application for consent to a voluntary transfer of control of a corporation holding a license for a radio station "shall be filed with the Commission at least 60 days prior to the contemplated effective date of assignment or transfer of control." Mr. Carlson observed that, in his opinion, it appeared from this bulletin that the

commission would rule upon an application within sixty days after its filing. The letter continued:

"It seems very clear that the Commission, by its own rule, has settled the matter over which we have had so many discussions and so much controversy, and I trust that this will meet with your final approval. No matter what our thoughts may have previously been in this particular, I do not believe that Mrs. Doernbecher should be asked to enter into an agreement tying up her property for a period longer than a time deemed ample by the Commission, itself. We have had a great deal of delay in this matter occasioned by both parties to the contemplated agreement, and I have received positive instructions from Mrs. Doernbecher that she has made her last and final concession in an attempt to make a satisfactory agreement.

"Unless the foregoing is entirely satisfactory to you, I have been instructed to return all matters to you, which belong to you in connection with this proposed sale, and to terminate any further negotiations relating to the sale of this property. If the foregoing is agreeable, I will assume the burden of revising the proposed agreement drawn by Mr. McInturff to carry out our amended thoughts to date.

"Mrs. Doernbecher has left for the East and it will be necessary for me to submit any proposed revised contract to her for her further consideration and possible signature."

Answering Mr. Carlson's letter, Mr. Sackett wrote, January 29th, that he did not construe the Federal commission's bulletin as stating that the commission would act upon the application within sixty days, the letter continuing:

"Our entire position always has been that we do not want to tie the FCC's hands and submit a contract which would automatically be breached if the FCC—which neither vendor nor vendee can control—does not act in a very limited time."

February 9th, Mr. Carlson wrote Mr. Sackett, stating that he had received instructions from Mrs. Doernbecher to discontinue further negotiations relating to the sale of the radio station and to return to Mr. Sackett all documents belonging to him. Mr. Carlson stated that he returned all such documents with his letter.

Appellant corporation was organized during the month of June, 1944, and this action was instituted shortly thereafter.

At the trial, Messrs. Sackett, McInturff, and Stone testified on behalf of appellant, and Mr. Carlson was called as a witness by respondents. The testimony was, in many instances, conflicting.

The trial judge entered no findings of fact at the close of the case, but orally stated his opinion and directed dismissal of the action. The court was satisfied that, at the time the memorandum was prepared, there was an express understanding between the parties that, if the sale of the corporate assets referred to in the memorandum would result in any tax liability on the part of Mrs. Doernbecher, a different method of consummating the transaction would be devised. We agree with the trial court that the memorandum was prepared and signed with such an understanding.

Appellant argues that the memorandum of July 27, 1943, was a binding contract for the sale of the license to operate a radio station and the assets of the broadcasting company; and that, thereafter, the parties entered into another binding contract, changing and amending the terms of the memorandum by providing for the sale, for cash, of the capital stock of the broadcasting company, plus an amount equal to cash on hand and accounts receivable. Appellant also contends that the memorandum of July 27, 1943, in so far as not expressly changed and amended, still stands, having particular reference to that portion of the memorandum to the effect that the contract should be executed and consummated after the approval of the transfer of the radio license by the Federal commission, without an express limit as to the period within which the Federal commission should act.

Respondents contend that the memorandum did not amount to a binding contract, but was subject to further negotiation and agreement by the parties; and that, even if it might be considered a binding agreement, it never became effective, for the reason that it was prepared and signed subject to the condition that it should not become effective prior to such time as the parties should be convinced that the contemplated transaction would not subject the respondents to any income tax liability. Respondents also argue that the parties never did reach a definite agreement as to

the terms and provisions of the formal contract which it was anticipated would be executed by the parties.

The "memorandum" recites that it was prepared as "a preliminary agreement concerning the essential terms to be embodied in a formal agreement." It also states that "both parties shall have the right hereafter to insert in the formal agreement minor conditions which are not stated today." This last portion of the memorandum clearly indicates that the document was not intended as a completed contract. It would be impossible to make a definite classification of minor conditions, and another classification of conditions other than minor. It would seem that even a so-called minor condition would require the agreement of both parties in order to become a part of the contract. If one party should refuse to consent to the inclusion in the final contract of any condition or conditions proposed by the other party, the making of the formal agreement would be delayed until one party or the other receded from his position.

Both parties agree that a later formal contract was contemplated by the parties and that no such contract was ever executed.

The proposed contract, which Mr. McInturff prepared and forwarded to Mr. Carlson, October 7th, contained a provision to the effect that the agreement would terminate if the Federal commission should fail to approve the sale within twenty-four months. This proposed agreement contained matter which had been the subject of discussion between the parties, and Mr. Carlson's comments on the proposed agreement were confined to those phases thereof covering matters previously in dispute. The correspondence resulted in the preparation by Mr. McInturff of the proposed contract, which he forwarded to Mr. Carlson December 7th, referred to above.

Apparently, up to this time, the matter of a fixed time limit within which the Federal commission should approve or disapprove the sale of the station, had not been a subject of any particular discussion. This question was now definitely before the negotiating parties for consideration. It was first presented in concrete form by Mr. McInturff. Mr.

Carlson at once objected to the fixing of such a long period within which the commission might act, stating that six months should be ample time for the commission to approve or disapprove the sale. Mr. McInturff and his client, after suggesting a limitation of eighteen months, apparently agreed to a limitation of twelve months. Mrs. Doernbecher was unwilling to agree upon such a long period of limitation, and the negotiations between the parties terminated as set forth above.

Appellant argues that the memorandum was, and is, a binding contract between the parties, whereby it was agreed that the effective date of the sale would be the date of the approval of the transfer by the Federal commission, whenever such an order would be entered. It would seem that appellant's counsel did not so read the agreement, as Mr. McInturff, in two separate instruments which he prepared, *supra,* placed a limitation of twenty-four months within which the commission's approval must be granted, or the proposed transaction would not be carried into effect.

Appellant relies strongly upon the testimony of Mr. Sackett to the effect that, at a consultation between the parties in Mr. Carlson's office during the month of January, 1944, he stated that, while he was willing to discuss the matter of time, "we are not willing to deviate from our position" that the parties had agreed to submit the contract to the commission, "and the effective date was the date set by the Commission without reference to limitation." Appellant also strongly relies upon the letter written by Mr. Sackett to Mr. Carlson, January 29, 1944 (*supra*).

Appellant argues that, if the parties found themselves unable to agree as to the provision of the memorandum with respect to time, the remedy would be to have the agreement construed by the courts.

In the case of *Stanton v. Dennis,* 64 Wash. 85, 116 Pac. 650, this court held that a written offer to furnish labor for a building, which contained the words "Formal contract to follow," and to which the person to whom the offer was made attached his signature after the word "Accepted," written on the letter, did not constitute a completed contract, and

that the record showed no more than an agreement settling some of the terms of a contract to be entered into later. The court called attention to some of the elements which would properly form a portion of such a contract and which were not referred to therein, with particular attention to the fact that the so-called contract specified no time for the beginning of the work, nor any time within which it should be completed. Concerning this phase of the case, the court said:

"While the law in such cases implies certain conditions, namely, that the work shall be commenced and completed within a reasonable time after demand, shall be performed in an ordinary skillful manner, and shall be paid for within a reasonable time after its completion, it is apparent that these conditions might not satisfy the appellant."

As observed by the court in the case last cited, in decreeing specific performance against an objecting party, it is not, in all cases, proper for the court to supply agreements not made by the parties because the portions of the contract so established by judicial decree seem reasonable. This is particularly true in cases such as the case at bar, where no recognized standard prevails by which a reasonable time for the approval of the transfer by the Federal commission could well be determined.

Mr. Sackett could not erase the effect of his attorney's suggestion by waiving or repudiating the same, particularly after Mr. Carlson had objected strongly to the suggested time limit.

Appellant relies upon the case of *Loewi v. Long,* 76 Wash. 480, 136 Pac. 673, in which this court held that a series of writings concerning the disposition of a crop of hops amounted to a completed contract, it being obvious that the parties, by the correspondence, had intended to establish a contractual relation. In the case cited, it appeared that the parties had in contemplation the execution of a formal written contract. This court held, however, that the informal writings constituted a completed contract, for a breach of which damages should be allowed. In the course of the opinion, the court said:

"The question is whether or not the correspondence above

set out establishes a contractual relation between the parties. To determine whether or not a contractual relation has been established by informal writings, such as letters and telegrams, where the parties have in mind the subsequent signing of a formal written contract, it is necessary to inquire, (a) whether the subject-matter has been agreed upon, (b) whether the terms are all stated in the informal writings, and (c) whether the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract. If the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain, then a contract exists between them by virtue of the informal writings, even though they may contemplate that a more formal contract shall be subsequently executed and delivered. [Citing cases.]"

 In the case at bar, we are convinced that the terms of the contract were not all stated in the memorandum, and that that document was not intended by the parties as a binding contract.

Following the case last cited, this court, in *Strange & Co. v. Puget Sound Machinery Depot,* 176 Wash. 90, 28 P. (2d) 111, held that certain writings which the parties had exchanged clearly showed that no binding contract had been entered into between them.

In the case of *McDonnell v. Coeur d'Alene Lbr. Co.,* 56 Wash. 495, 106 Pac. 135, this court considered questions quite similar to those here presented. The action was based upon an alleged oral contract for the logging of a tract of timber. The making of a written contract was postponed until the arrival of an officer of the defendant corporation "to arrange the details in regard to the payments." The majority of the court, after citing 9 Cyc. 280, and Clark, Contracts, p. 62, affirmed the judgment of the trial court entered in favor of the defendants upon a directed verdict.

In the recent case of *Keys v. Klitten,* 21 Wn. (2d) 504, 151 P. (2d) 989, this court affirmed a judgment of the superior court dismissing an action for specific performance. As in the case at bar, the testimony in the case cited was in considerable conflict. In the course of the opinion, we said:

"To paraphrase a statement found in *Weldon v. Degan,* 86 Wash. 442, 446, 150 Pac. 1184, the earnest money receipt is

no more than an agreement for a lease, or, in other words, an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete, and to which either of the parties might object if proposed. A contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations. 6 R. C. L., p. 617, § 38. In order for a court of equity to decree specific performance of a contract, the court must be able to determine what must be done to constitute performance. The indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act which is to be done clearly ascertainable. 49 Am. Jur. 34, § 22."

We also cited the case of *Thompson v. Weimer*, 1 Wn. (2d) 145, 95 P. (2d) 772, in which case this court had quoted with approval from 25 R. C. L. 218, Specific Performance, § 17, as follows:

" ' "One of the fundamental rules respecting the specific performance of contracts is that performance will not be decreed where the contract is not certain in its terms. The terms must be complete and free from doubt or ambiguity, and must make the precise act which is to be done clearly ascertainable." ' "

In Restatement of the Law of Contracts, vol. 1, p. 33, § 26, is found the following:

"EXISTENCE OF CONTRACT WHERE WRITTEN MEMORIAL IS CONTEMPLATED.

"Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in § 25.
"*Comment:*

"*a.* Parties who plan to make a final written instrument as the expression of their contract, necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract to execute subsequently a

final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then fulfilled all the requisites for the formation of a contract. On the other hand, if the preliminary agreement is incomplete, it being apparent that the determination of *certain details* is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract." (Italics ours.)

As stated above, in the case at bar there is a sharp conflict in the evidence as to the intentions of the respective parties during the negotiations. The terms of the memorandum, however, are plain. It was a "preliminary agreement concerning the essential terms to be embodied in a formal agreement" between the parties.

"The main conditions and terms are embodied herewith, although both parties shall have the right hereafter to insert in the formal agreement minor conditions which are not stated today."

The subsequent written and oral negotiations between the parties throw considerable light upon their intentions and understandings. It appears, without question, that, when the memorandum was signed, both parties were in doubt as to the method which should be followed in transferring the radio station and the property connected therewith. "Proposed" forms of contracts were prepared and submitted for consideration.

After careful consideration, we are convinced that the memorandum of July 27, 1943, was not, and never was intended to be, a binding contract between the parties, and that no such contract ever came into existence, then or later.

The judgment appealed from is affirmed.

DRIVER, C. J., BLAKE, ROBINSON, and JEFFERS, JJ., concur.